# United States Court of Appeals
## For the First Circuit

No. 08-1569

PAUL SIMMONS; PEDRO VALENTIN; DENNIS BELDOTTI,

Plaintiffs, Appellees/Cross-Appellants,

v.

WILLIAM FRANCIS GALVIN,
in his capacity as Secretary of the Commonwealth of Massachusetts,

Defendant, Appellant/Cross-Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Boudin, Circuit Judges.

Kenneth W. Salinger, Assistant Attorney General, and Peter Sacks, Assistant Attorney General, with whom Martha Coakley, Attorney General of Massachusetts, was on brief for appellant/cross-appellee.
Christopher P. Silva with whom Thomas H. Wintner, Gail E. Cornwall, and Edwards Angell Palmer & Dodge, LLP were on brief for appellee/cross-appellant.

July 31, 2009

**LYNCH**, **Chief Judge**.  By nearly a two-to-one margin in the year 2000, Massachusetts voters passed Article 120, which amended the state constitution to disqualify currently incarcerated felons from voting in certain elections.  Shortly thereafter, the state legislature extended this disqualification by statute, Chapter 150, to prevent inmates from voting in all Massachusetts elections.

In 2001, several incarcerated felons in state custody, challenged these provisions (collectively "Article 120") by suing the Secretary of the Commonwealth in federal court.  This appeal concerns two of their claims: (1) that the Commonwealth's disenfranchisement provisions violated the Voting Rights Act ("VRA") § 2, 42 U.S.C. § 1973, because the percentage of imprisoned felons who are Hispanic or African-American is higher than the percentages of those groups in the population of the state; and (2) that the provisions violated the Ex Post Facto Clause, U.S. Const. art. I, § 10, as to those inmates who were not disqualified from voting before the these provisions took effect.  As to their claim under the VRA, the plaintiffs make no allegation of any intentional discrimination or of any history by Massachusetts of intentional discrimination against minority voters.  All they have claimed is that past practices in the Massachusetts criminal justice system produced inmate populations which, in combination with the disqualification of inmates imprisoned for felonies, have resulted

in disproportionate disqualification of minorities from voting. Theirs is a claim of disparate impact.

After allowing initial discovery, the district court in 2007 denied the Commonwealth's motion for entry of judgment on the pleadings on plaintiffs' VRA claim but granted the Commonwealth's motion for summary judgment on the Ex Post Facto Clause argument.

We think it clear from the language, history, and context of the VRA that Congress never intended § 2 to prohibit the states from disenfranchising currently incarcerated felons. We do not say that direct vote denial claims of other types may not be brought under § 2, only that no VRA claim is stated against a state law which disenfranchises incarcerated felons. We reverse and order the dismissal of the VRA § 2 claim. We affirm the grant of summary judgment on the Ex Post Facto claim.

I.

A.      Enactment of the Massachusetts Incarcerated Felon Disenfranchisement Provisions

Before Article 120 was enacted, prisoners were able to vote by absentee ballot. In 1997, there was an unsuccessful proposal for legislation to disenfranchise currently incarcerated persons for certain felonies: murder, rape, other sex-related offenses, and controlled substances offenses. Massachusetts prisoners responded by forming a political action committee ("PAC"), aimed at influencing criminal justice issues, including

-3-

sentencing, prison reform, and "Draconian laws on punishment." PACs, inter alia, raise money for and endorse candidates.

State elected officials reacted swiftly. On August 12, 1997, then-Acting Governor Cellucci proposed a constitutional amendment that would disenfranchise all incarcerated individuals (not just felons), saying:

> Criminals behind bars have no business deciding who should govern the law-abiding citizens of the Commonwealth. This proposed amendment will ensure that criminals pay their debt to society before they regain their right to participate in the political process.

The legislature did not act on this proposal. Rather, the legislature approved a different proposed amendment that would disenfranchise only those currently incarcerated for felonies. Lawmakers received the legal opinions of House and Senate Counsel that such an alternative amendment would be constitutional under the U.S. Constitution.

Article 120, the proposed amendment to Article 3 of the Amendments to the state constitution, was presented to the voters along with an Information for Voters Guide. That Guide constitutes relevant legislative history. The Guide included 150-word arguments written by proponents and opponents of each ballot question. The statement from the proponents stated, "A yes vote prevents criminals serving time for a felony conviction from voting in Massachusetts's elections while in jail." The proponents argued:

-4-

When someone in Massachusetts is sentenced to jail for committing a felony, we deprive them of their liberty and right to exercise control over their own lives, yet current law allows these same criminals to continue to exercise control over our lives by voting from prison. This amendment will change the law that gives jailed criminals the right to vote.

Massachusetts is one of only three states in our nation where felons serving time may vote while in jail. Voting yes on this important question will make the Commonwealth the 48th state to prohibit the practice of allowing convicted criminals to vote from jail. This change discriminates against no one except jailed criminals.

The Guide also contained the opponents' argument:

The Constitution of Massachusetts is clear on this point: Citizens retain their right to vote even while incarcerated. The founders of Massachusetts intended this right, and our Supreme Judicial Court affirmed in in 1977. In the history of the Commonwealth, we have never amended our Constitution in order to narrow fundamental rights. There is no reason to do so now.

No one has alleged that prisoner voting has harmed our democracy or social fabric. Very few prisoners vote, and no one claims that prisoner voting has negatively influenced any election. Stripping incarcerated felons of their right to vote serves no public safety function. It will not deter crime, repair the harm done by crime, nor help to rehabilitate prisoners.

The voters approved the amendment with 60.3% voting "yes" to 33.9% voting "no," and 5.8% of voters not casting a vote on the question. The amendment took effect on December 6, 2000. Article 3 now reads:

> Every citizen of eighteen years of age and
> upwards, <u>excepting persons who are
> incarcerated in a correctional facility due to
> a felony conviction</u>, and excepting persons
> under guardianship and persons temporarily or
> permanently disqualified by law because of
> corrupt practices in respect to elections who
> shall have resided within the town or district
> in which he may claim a right to vote, six
> calendar months next preceding any election of
> governor, lieutenant governor, senators or
> representatives, shall have a right to vote in
> such election of governor, lieutenant
> governor, senators and representatives; and no
> other person shall be entitled to vote in such
> election.

Mass. Const. amend. art. 3 (emphasis added).

The Massachusetts legislature then enacted Chapter 150 of the Acts of 2001, which effectuated Article 120 by broadening the ban on felon voting to cover all Massachusetts elections and by changing the statutory requirements for obtaining absentee ballots. Chapter 150 took effect November 27, 2001. Unlike many other states, Massachusetts does not disqualify convicted felons from voting once they are released from prison.

B.      Procedural History of the Litigation

Plaintiffs Paul Simmons, an African-American, Pedro Valentin, a Hispanic-American, and Dennis J. Beldotti, a Caucasian-American, are Massachusetts residents currently in the custody of the Massachusetts Department of Correction for felonies they committed on or before December 5, 2000. Plaintiffs were eligible to be Massachusetts voters before that date, but the record does not reveal whether they were registered to vote.

Plaintiffs' pro se complaint was amended twice by court-appointed counsel. Their final amended complaint alleged that Article 120 violates § 2 of the VRA because it has a "disproportionately adverse effect on the voting rights of African-Americans and Hispanic Americans compared to its effect on the voting rights of other citizens." This effect "is caused by, among other things, the facts that African-Americans and Hispanic-Americans are over-represented in the population of Massachusetts incarcerated felons, and that there exists considerable racial and ethnic bias, both direct and subtle, in the Massachusetts court system."[1] Article 120, plaintiffs contended, "interact[s] with social and historical conditions to cause an inequality in the opportunities enjoyed by minority and non-minority voters to elect their preferred representatives."

In describing plaintiffs' complaint, which alleges a "vote denial" claim, we distinguish vote denial cases from vote dilution[2] claims under § 2 of the VRA. The Supreme Court first

---

[1] By "over-represented" the complaint referred to the representation of African-Americans and Hispanic-Americans in the prison population compared with their representation in the Massachusetts population at large, but gave no statistics.

[2] Vote dilution claims comprise the vast majority of § 2 claims. See E. Katz et al., Documenting Discrimination in Voting: Judicial Findings Under Section 2 of the Voting Rights Act Since 1982, 39 U. Mich. J.L. Reform 643, 650 (2005), available at http://sitemaker.umich.edu/votingrights/files/finalreport.pdf; D.P. Tokaji, The New Vote Denial: Where Election Reform Meets the Voting Rights Act, 57 S.C. L. Rev. 689, 709 (2006) ("[I]t is clear that the overwhelming majority of Section 2 lawsuits since 1982 have

-7-

articulated the distinction in explaining that "[t]he right to vote can be affected by a <u>dilution</u> of voting power as well as by an absolute prohibition on casting a ballot." <u>Shaw</u> v. <u>Reno</u>, 509 U.S. 630, 640 (1993) (quoting <u>Allen</u> v. <u>State Bd. of Elections</u>, 393 U.S. 544, 569 (1969)). Thus in voting rights parlance, "'[v]ote denial' refers to practices that prevent people from voting or having their votes counted." D.P. Tokaji, <u>The New Vote Denial: Where Election Reform Meets the Voting Rights Act</u>, 57 S.C. L. Rev. 689, 691 (2006). Vote denial cases challenge practices such as literacy tests, poll taxes, white primaries, and English-only ballots. <u>Id.</u> By contrast, vote dilution challenges involve "practices that diminish minorities' political influence," such as at-large elections and redistricting plans that either weaken or keep minorities' voting strength weak. <u>Id.</u>; <u>see also</u> P.S. Karlan, <u>The Impact of the Voting Rights Act on African Americans</u>, <u>in</u> <u>Voting Rights and Redistricting</u> 121, 122 (M.E. Rush ed., 1998).

To be clear, plaintiffs did not allege and have disavowed making a § 2 vote dilution claim, such as that the votes of African-Americans and Hispanics who are not imprisoned for felonies have been diluted by Article 120. This case also does not involve any claim that generalized rules or practices governing the administration of elections have resulted in a disproportionate

_____

involved claims of vote dilution and not vote denial."); <u>see generally</u>, <u>Bartlett</u> v. <u>Strickland</u>, 129 S. Ct. 1231, 1240-41 (2009) (plurality opinion).

denial of votes of minorities. Further, plaintiffs have not asserted that the state has otherwise created barriers to the election of minority group members or other participation of minorities in the political process. Finally, the plaintiffs' complaint made no allegation that the Commonwealth acted with racially discriminatory intent or purpose in enacting Article 120, and plaintiffs have specifically disavowed any such claim. This is a claim based purely on the allegation that Article 120 has a disparate impact on minorities by disqualifying from voting imprisoned felons.

In support of their pleadings, the complaint referred to and appended a 1994 Final Report by the Commission to Study Racial and Ethnic Bias in the Courts to the Massachusetts Supreme Judicial Court ("SJC").[3] Plaintiffs alleged the legislators were aware of or should have been aware of the conclusions in that 1994 Report. That 1994 Report, however, was not referenced in or part of the Voters Guide, and there is no claim the voters were aware of it.

---

[3] The specific findings in the 1994 Commission Report, as stated in the pleadings, included that "racial minorities were underrepresented in jury pools selected from communities with large racial and ethnic populations; that Massachusetts courts are an unfriendly environment for people whose primary language is not English . . . ; and that minorities are underrepresented in [the] Massachusetts bar and bench." The 1994 Report itself goes on to say, as to sentencing, that it lacked the necessary data to "test [the] hypothesis" that "[r]acial and ethnic bias may influence sentencing decisions." The report did not conclude that any race bias resulted in minority defendants being sentenced as felons.

Plaintiffs further alleged that Article 120 is punitive in purpose and effect and therefore violates the Ex Post Facto Clause as to those inmates who committed their offenses before the disenfranchisement measures took effect.

The relief sought was a declaration that Article 120 was unconstitutional under the Ex Post Facto Clause and illegal under § 2 of the VRA, injunctive relief, and costs and attorneys' fees.

Plaintiffs unsuccessfully moved for a preliminary injunction; defendant opposed, filing affidavits which described the legislative history of Article 120 and the ratification process. The parties conducted written discovery.[4] Defendant then moved for summary judgment as to the Ex Post Facto and equal protection claims and for judgment on the pleadings as to the VRA § 2 claim on January 12, 2007. The plaintiffs opposed the Commonwealth's motions and also cross-moved for summary judgment as to the Ex Post Facto and equal protection claims.

On August 30, 2007, the district court granted the Commonwealth's motion for summary judgment on the Ex Post Facto Clause claim and the equal protection claim and denied plaintiffs'

---

[4] Plaintiffs served interrogatories and document requests on defendant William Galvin, Secretary of the Commonwealth, seeking data as to the effect of Article 120 on minorities. For example, plaintiffs requested through interrogatories information on all individuals who have been arrested in Massachusetts since 1985 by name, date of birth, Social Security Number, race, ethnicity, skin color, and/or alleged offense. Defendant replied saying defendant did not maintain such records and had no responsive information.

cross-motion.  The court denied the Commonwealth's motion on the VRA claim.  On January 16, 2008, the district court certified its order on the VRA claim for interlocutory appeal.  Plaintiffs petitioned to cross-appeal on the Ex Post Facto and equal protection claims.  This court granted leave to appeal all three claims under 28 U.S.C. § 1292(b).  Plaintiffs have abandoned the Equal Protection Clause claim and contest only the Ex Post Facto Clause ruling, and the Commonwealth appeals the denial of its motion for judgment on the pleadings as to the VRA § 2 claims.

C.        Standard of Review

Our review of the court's ruling on both claims is de novo, and we take the facts in the light most favorable to the plaintiffs.  Estate of Bennett v. Wainwright, 548 F.3d 155, 163, 165 (1st Cir. 2008) (considering dismissals under Rule 12(c) and Rule 56).  We treat the denial of a motion for judgment on the pleadings "much like a Rule 12(b)(6) motion to dismiss." Pérez-Acevedo v. Rivero-Cubano, 520 F.3d 26, 29 (1st Cir. 2008).[5] "[T]o survive a Rule 12(b)(6) motion (and, by extension, a Rule

---

[5]  Despite the nomenclature of the defendant's motion on the VRA § 2 claim as a motion for judgment on the pleadings, in fact both sides brought additional undisputed materials to the court's attention.  "In reviewing a motion [for judgment on the pleadings] under Rule 12(c) . . . we may consider 'documents the authenticity of which are not disputed by the parties; . . . documents central to plaintiffs' claim; [and] documents sufficiently referred to in the complaint.'"  Curran v. Cousins, 509 F.3d 36, 44 (1st Cir. 2007) (alteration and omission in original) (quoting Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993)).

12(c) motion) a complaint must contain factual allegations that 'raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true.'" Id. (quoting Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007)). Nonetheless, questions of statutory interpretation are questions of law ripe for resolution at the pleadings stage. Gen. Motors Corp. v. Darling's, 444 F.3d 98, 107 (1st Cir. 2006) ("Statutory interpretation typically raises questions of law engendering de novo review.").

## II.

### VRA § 2 CLAIM

Plaintiffs' § 2 challenge is to the Massachusetts law disenfranchising only currently incarcerated felons. Article 120 is among the narrowest of state felon disenfranchisement provisions.[6] Only two states permit incarcerated felons to vote, and Massachusetts is one of thirteen jurisdictions that limit disenfranchisement to the period of incarceration. Currently, thirty-five states prevent felons from voting during the period of their parole or probation or both. Eleven states disenfranchise

---

[6] See Developments in the Law -- One Person, No Vote: The Laws of Felon Disenfranchisement, 115 Harv. L. Rev. 1939, 1942-49 (2002) (surveying state felon disenfranchisement statutes). This led the student law review note to comment: "The nation seems to be nearing a consensus that the presently incarcerated should not have the right to vote." Id. at 1942.

felons beyond the term of their incarceration, probation, and parole.  Two states disenfranchise felons for life.

The question of state felon disenfranchisement laws and the VRA § 2 has been addressed by five circuits.  Four circuits, including two en banc, have rejected § 2 challenges to broader disqualifications; one panel in the Ninth Circuit had allowed such a § 2 challenge to go forward, although it was ultimately unsuccessful.  The Second Circuit, consistent with our holding here, has rejected a § 2 challenge to a state statute disenfranchising prisoners, as well as parolees.  Hayden v. Pataki, 449 F.3d 305 (2d Cir. 2006) (en banc).  Faced with a state lifetime felon disenfranchisement law, the Eleventh Circuit concluded in an en banc decision that all felon disenfranchisement claims are excluded from the scope of § 2 of the VRA.  Johnson v. Gov. of Fla., 405 F.3d 1214 (11th Cir. 2005) (en banc).  Two circuits have rejected similar claims on the pleadings without directly considering whether felon disenfranchisement statutes are immune from attack under § 2.  Howard v. Gilmore, No. 99-2285, 2000 WL 203984, at *1 (4th Cir. Feb. 23, 2000) (per curiam); Wesley v. Collins, 791 F.2d 1255, 1259-61 (6th Cir. 1986) (treating claim as a dilution claim).  Our conclusion accords with that of the majority of the circuits.

A Ninth Circuit panel decision has concluded that some disenfranchisement statutes, not as narrow as this one, may be

-13-

challenged under § 2.  Farrakhan v. Washington, 338 F.3d 1009 (9th Cir. 2003) (addressing disenfranchisement of those convicted of an "infamous crime" until those former felons comply with civil rights restoration statute).  Over a dissent by seven judges, the Ninth Circuit denied the state's petition for rehearing en banc in that case, Farrakhan v. Washington, 359 F.3d 1116, 1116 (9th Cir. 2004) (Kozinski, J., dissenting).  On remand, judgment was entered for the state.  Farrakhan v. Gregoire, No. CV-96-076-RHW, 2006 WL 1889273 (E.D. Wash. July 7, 2006).

A.          Constitutional Background to the VRA § 2 Claim

Under the U.S. Constitution, the states generally set the eligibility criteria for voters. "[T]he Constitution 'does not confer the right of suffrage upon any one.'"  Rodriguez v. Popular Democratic Party, 457 U.S. 1, 9 (1982) (quoting Minor v. Happersett, 88 U.S. (21 Wall.) 162, 178 (1875)); see also U.S. Const. art. I, § 4; id. amend. XIV, § 2; Bush v. Gore, 531 U.S. 98, 104 (2000) (per curiam) ("The individual citizen has no federal constitutional right to vote for electors for the President of the United States unless and until the state legislature chooses a statewide election as the means to implement its power to appoint members of the electoral college.").

The criteria for eligibility to vote are defined by the states, subject to certain federal restrictions, such as the federal constitutional prohibition on exclusion from the franchise

-14-

on the basis of race, sex, or payment of a poll tax. "No function is more essential to the separate and independent existence of the States and their governments than the power to determine within the limits of the Constitution the qualifications of their own voters for state, county, and municipal offices." Oregon v. Mitchell, 400 U.S. 112, 125 (1970).

The power of the states to disqualify from voting those convicted of crimes is explicitly set forth in § 2 of the Fourteenth Amendment. The Supreme Court has held, "the exclusion of felons from the vote has an affirmative sanction in § 2 of the Fourteenth Amendment." Richardson v. Ramirez, 418 U.S. 24, 55 (1974). Section 2 concerns the abridgement of the right to vote at any election for "President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or members of the Legislature." U.S. Const. amend. XIV, § 2. The Amendment specifically excludes (from its non-abridgement language) and thus provides for the denial by states of the right to vote to persons "for participation in rebellion, or other crime." Id. The Fourteenth Amendment also grants Congress the power to enforce, by appropriate legislation, the provisions of that article. Id. § 5. Thus, the state's denial of the right to vote to felons has a constitutional grounding.

-15-

Broad felon disenfranchisement provisions are presumptively constitutional. See Richardson, 418 U.S. at 54-55.[7] There, the Court rejected a non-race-based equal protection challenge to the felon disenfranchisement provision of California's constitution. The Supreme Court has continued to adhere to Richardson. See Romer v. Evans, 517 U.S. 620, 634 (1996) (describing principle that states may disenfranchise a convicted felon as "unexceptionable").

Richardson, to be clear, does not hold that a state felon disenfranchisement law may never raise equal protection concerns. If a state enacts a law which disenfranchises felons "with the intent of disenfranchising blacks," that state has run afoul of § 1 of the Fourteenth Amendment. Hunter v. Underwood, 471 U.S. 222, 229 (1985) (holding Alabama's petty crime and misdemeanor disenfranchisement provisions unconstitutional under Equal Protection Clause based on evidence of discriminatory intent); see also City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 477 n.25 (1985) ("[In Hunter], we did not suggest that felons could not be deprived of the vote through a statute motivated by some purpose other than racial discrimination."). Here, plaintiffs make no allegation of intentional discrimination, and on appeal

---

[7] The SJC has also recognized that under Richardson states may disenfranchise felons. Dane v. Bd. of Registrars of Voters, 371 N.E.2d 1358, 1364 (Mass. 1978) ("Disfranchisement of convicted criminals by State law was held by the . . . Supreme Court in Richardson . . . not to violate the equal protection clause.").

-16-

they allege no constitutional violation other than the Ex Post Facto claim. By definition, then, plaintiffs do not assert that whatever discrimination existed in the state's criminal justice system rose to the level of an independent constitutional violation which caused the vote denial.

A state's interest in preventing "persons who . . . were not eligible to vote because they had been convicted of felonies" from inflating its voter rolls was accepted only last year by the Supreme Court as a "neutral and nondiscriminatory reason" for a voter identification law. Crawford v. Marion County Election Bd., 128 S. Ct. 1610, 1619-20 (2008).

The legitimacy of the reasons for this state interest in disqualifying imprisoned felons from voting is apparent. Judge Henry Friendly some time ago described some of the pragmatic purposes underlying disenfranchisement laws:

> [I]t can scarcely be deemed unreasonable for a state to decide that perpetrators of serious crimes shall not take part in electing the legislators who make the laws, the executives who enforce these, the prosecutors who must try them for further violations, or the judges who are to consider their cases.

Green v. Bd. of Elections, 380 F.2d 445, 451 (2d Cir. 1967).[8]

---

[8] There are philosophical reasons as well, such as that those who violate the laws so seriously have removed themselves from the Lockean notion of the social contract:

> The early exclusion of felons from the franchise by many states could well have rested on Locke's concept, so influential at the time, that by entering into society every

-17-

Here, the Commonwealth enacted this prohibition after prisoners attempted to organize to change the laws under which they were convicted, sentenced, and imprisoned. The state has a strong interest in setting its own qualifications for voters, a strong interest in the integrity of its system of enforcing and administering its criminal laws, and a strong interest in how its correctional systems are maintained and run. Preiser v. Rodriquez, 411 U.S. 475, 491-92 (1973) ("It is difficult to imagine an activity in which a State has a stronger interest . . . than the administration of its prisons."); cf. Hayden, 449 F.3d at 327. The Massachusetts provision, it is important to note, is narrowly tailored. Because the disqualification is confined to currently imprisoned felons, the state interests it serves are clearly at their strongest.

Further, Article 120 of the Massachusetts constitution does not raise issues about a history of laws in Massachusetts, including felon disenfranchisement laws, that were used deliberately to impede voting by minorities. Such historical

man "authorizes the society, or which is all one, the legislature thereof, to make laws for him as the public good of the society shall require, to the execution whereof his own assistance (as to his own decrees) is due." A man who breaks the laws he has authorized his agent to make for his own governance could fairly have been thought to have abandoned the right to participate in further administering the compact.
Green, 380 F.2d at 451.

concerns about practices in other states have been the subject of academic commentary. <u>See,</u> <u>e.g.,</u> G. Brooks, Comment, <u>Felon Disenfranchisement: Law, History, Policy and Politics</u>, 32 Fordham Urb. L.J. 851, 858-59 (2005) (concluding that the VRA does not reach state felon disenfranchisement laws). Plaintiffs have made no claim that Massachusetts has historically ever used any tests or devices to discourage minority voting or minority candidates. Nor is there any claim that Massachusetts has defined Article 120 disenfranchisement in terms of felonies that have higher conviction rates for minorities than for whites. <u>Cf.</u> <u>Hunter</u>, 471 U.S. at 229.

B.        <u>Text, Context and Legislative History of § 2</u>

It is against the backdrop of the Constitution's express approval of felon disenfranchisement provisions, which were not motivated by intentional race discrimination, that Congress enacted the VRA in 1965.

Section 2 of the VRA, 42 U.S.C. § 1973, as amended in 1982, now provides:

> (a)  No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . .

> (b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in

-19-

> the State or political subdivision are not
> equally open to participation by members of a
> class of citizens protected by subsection (a)
> in that its members have less opportunity than
> other members of the electorate to participate
> in the political process and to elect
> representatives of their choice.

While the language of the original § 2 tracked the language of the Fifteenth Amendment, prohibiting practices that deny or abridge the right to vote on account of race, the 1982 amendment to § 2 inserted the phrase "results in a denial or abridgment." § 1973(b) (emphasis added). The amendment of § 2 also made clear that an abridgement or denial could be identified "as provided in subsection (b)," which was added by the 1982 amendments.

To start, it is clear that under the plain terms of the statute, not every "voter qualification" is actionable under § 2. For § 2 to apply, the burden is on the plaintiffs to make other showings, including that the qualification "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." § 1973(a); see also Metts v. Murphy, 363 F.3d 8, 12 (1st Cir. 2004) (en banc) (per curiam).

Plaintiffs' theory of how they meet this burden under § 2 is that from the very enactment of § 2 in 1965, the broad language of § 2 has created a cause of action on these facts. Article 120, they contend, is obviously a voter disqualification and the disqualification results in a denial of the right to vote "on account of race" because the percentages of incarcerated felons

-20-

who are black or Hispanic are higher than those two groups in the population as a whole.

Plaintiffs argue the language of § 2(a) is so clear it stands alone and that rules of statutory construction prohibit consideration of the history or context of § 2.[9] Plaintiffs' claim assumes that felon disenfranchisement laws are not different from and should be treated like any other voting qualification under § 2. That assumption is a fatal flaw in their case. Felon disenfranchisement statutes are not like all other voting qualifications. Congress has treated such laws differently. They are deeply rooted in our history, in our laws, and in our Constitution. We conclude Congress did not intend § 2 to provide a cause of action against Article 120.

As a matter of textual analysis, it is neither plain nor clear that plaintiffs' claim fits within the text of § 2(a). For example, it is logical to understand the state law

---

[9] In addition, plaintiffs contend § 2(a) must be read to be independent of § 2(b), which was added by the 1982 amendments. And even if § 2(b) is read as informing and restricting the meaning of § 2(a), plaintiffs submit, they have nonetheless stated a claim under the clear language of § 2(a).

Plaintiffs alternatively argue that, to the extent § 2(b) may be considered, it only establishes a totality of the circumstances test for proving a violation of § 2(a) and in no way limits the scope of § 2(a). Plaintiffs argue that, to the extent § 4 and § 5 (which ban certain practices) are relevant, those later sections demonstrate only that Congress meant § 2(a) to be read broadly. If legislative history is consulted, they argue that the legislative history of § 2 establishes that their claim falls within Congress's intent in enacting § 2.

disenfranchisement of incarcerated felons as not "resulting" in a denial "on account of race or color" but on account of imprisonment for a felony, and thus not within the text of § 2 at all.[10]  We agree with the Second Circuit that the language of § 2(a) is both broad and ambiguous and that judicial interpretation of a claim concerning felon disenfranchisement under the VRA may not be limited to the text of § 2(a) alone.  See Hayden, 449 F.3d at 315 (citing Watt v. Alaska, 451 U.S. 259, 266 (1981); Boston Sand & Gravel Co. v. United States, 278 U.S. 41, 48(1928)).

Under any set of rules of construction, our inquiry into § 2(a) neither starts nor ends with an examination of that text. "[S]tatutory interpretation turns on 'the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.'"  Nken v. Holder, No. 08-681, ___ S. Ct. ___, 2009 WL 1065976, at *6 (Apr. 22, 2009) (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997)).

Under Supreme Court precedent, we cannot adopt plaintiffs' limited approach.  The direction to look at context,

---

[10]  There are questions as to whether a claim of disparate impact is sufficient to state a § 2 vote denial case.  See Johnson, 405 F.3d at 1235-37 (Tjoflat, J., concurring); see also Goosby v. Town Bd. of Hempstead, 180 F.3d 476, 499 (2d Cir. 1999) (Leval, J., concurring); Nipper v. Smith, 39 F.3d 1494, 1524-25 (11th Cir. 1994) (en banc); LULAC v. Clements, 999 F.2d 831, 859-63 (5th Cir. 1993) (en banc).  Whether a claim of mere disproportionality alone supports a "resulting" claim is not clear under § 2 and is a difficult question we need not reach.

structure, history, and constitutional concerns is particularly true of the VRA, a complex statute with an extensive legislative history and caselaw.  See Nw. Austin Mun. Util. Dist. No. 1 v. Holder, No. 08-322, ___ S. Ct. ___, 2009 WL 1738645 at *10 (June 22, 2009) ("[S]pecific precedent, the structure of the Voting Rights Act, and underlying constitutional concerns compel a broader reading of the [VRA's] bailout provision.").  The Supreme Court itself, in deciding § 2 cases has never resorted to plain text alone to give § 2 meaning.  See, e.g., Chisom v. Roemer, 501 U.S. 380, 397 (1991).  It has commonly used legislative history. See League of United Latin Am. Citizens v. Perry, 548 U.S. 399, 426 (2006); see also 2A N.J. Singer & J.D. Singer, Sutherland Statutes and Statutory Construction § 48A:11 (7th ed. 2008) ("In reviewing legislative history, the Court consults . . . committee reports, floor debates, hearings, rejected proposals, and even legislative silence.").

In examining § 2, we are required to comply with "the cardinal rule that a statute is to be read as a whole," King v. St. Vincent's Hosp., 502 U.S. 215, 221 (1991).  As "the meaning of statutory language, plain or not, depends on context," id., we must "look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy."  Dada v. Mukasey, 128 S. Ct. 2307, 2317 (2008) (quoting

<u>Gozlon-Peretz</u> v. <u>United States</u>, 498 U.S. 395, 407 (1991)) (internal quotation marks omitted).

When we look at the terms of the original VRA as a whole, the context, and recognized sources of congressional intent, it is clear the original § 2 of the VRA of 1965 was not meant to create a cause of action against a state which disenfranchises its incarcerated felons. The purposes and congressional history of the 1982 amendments, as well as congressional action after 1982, further confirm our understanding that § 2 does not encompass this claim.

1.    The Original VRA of 1965

The original VRA was enacted against the background of explicit constitutional and congressional[11] approval of state felon disenfranchisement laws and expressed no intention to invalidate such laws, but rather an intention to leave such laws untouched.

Prior to the enactment of the VRA, enforcement of the Fifteenth Amendment guarantee that the "right of citizens of the United States to vote shall not be denied or abridged . . . on account of race, color, or previous condition of servitude," U.S. Const. amend. XV, § 1, was unsatisfactory. <u>Nw. Austin</u>, 2009 WL 1738645 at *4.

---

[11]    Indeed, in re-admitting southern states to the Union following the Civil War, Congress approved new state constitutions containing felon disenfranchisement provisions. <u>Richardson</u>, 418 U.S. at 48-52.

In 1965, Congress enacted the VRA with the intent to "banish the blight of racial discrimination in voting, which ha[d] infected the electoral process in parts of our country for nearly a century." South Carolina v. Katzenbach, 383 U.S. 301, 308 (1966). Plaintiffs' claim here concededly does not involve any such intent. The language of the original § 2 "tracked . . . the text of the Fifteenth Amendment," Bartlett, 129 S. Ct. at 1240. The Court emphasized this point when it said that the original § 2 did "no more than elaborate[] upon . . . the Fifteenth Amendment," id. at 1241 (omission in original) (quoting City of Mobile v. Bolden, 446 U.S. 55, 60-61 (1980) (plurality opinion)) (internal quotation marks omitted). The VRA's original object was plainly to combat specific forms of racial discrimination.[12] Beyond § 2, the remainder of the VRA set up a scheme of stringent remedies to address the most flagrant practices. "[T]he Act directly pre-empted the most powerful tools of black disenfranchisement in the covered areas. All literacy tests and similar voting qualifications were abolished by §4 of the Act." Nw. Austin, 2009 WL 1738645, at *4 (citing Voting Rights Act of 1965, §§ 4(a)-(d), 79 Stat. 437, 438-439).

---

[12] Plaintiffs rely heavily on the Court's statement, in a vote dilution case, that Congress intended "to give the Act the broadest possible scope," Allen v. State Bd. of Elections, 393 U.S. 544, 567 (1969) (interpreting the phrase "qualification . . . or procedure" in § 2(a)). This language in Allen must be understood in light of the Court's other statements in subsequent cases, including Bolden and Bartlett.

The legislative history of the VRA shows that Congress was not silent with respect to felon disenfranchisement laws. In fact, Congress explicitly considered the effect of the VRA on state felon disenfranchisement laws, and did so under § 4, rather than under § 2.[13] Section 4 of the VRA bans any "test or device" that impermissibly limits the franchise. 42 U.S.C. § 1973b(c). Congress, in enacting § 4(c) proscribed several categories of historically discriminatory tests or devices, including some literacy tests, educational achievement or knowledge tests, and good moral character qualifications. But Congress was careful to carve out from its proscription of tests for good moral character any and all state felon disenfranchisement laws. H.R. Rep. No. 89-439 (1965), reprinted in 1965 U.S.C.C.A.N. 2437, 2547-57. In excluding felon disenfranchisement laws from the scope of § 4, Congress took the view that it did not consider such laws to be a discriminatory voter qualification or a "tool[] of black disenfranchisement." Nw. Austin, 2009 WL 1738645, at *4.

The Senate Judiciary Committee Report explicitly stated that this § 4 prohibition on tests and devices "would not result in the proscription of the frequent requirement of States and political subdivisions that an applicant for voting or registration for voting be free of conviction of a felony or

---

[13]    The 1965 legislative history indicates that Congress focused much more attention on the import of § 4 and § 5 than on § 2 of the VRA.

mental disability."  S. Rep. No. 89-162 (1965), reprinted in 1965
U.S.C.C.A.N. 2508, 2562 (joint views of Senators Dodd, Hart, Long,
Kennedy, Bayh, Burdick, Tydings, Dirksen, Hruska, Fong, Scott, and
Javits).

The House Report confirms the Senate's understanding.  It
stated that the VRA "does not proscribe a requirement of a State
or any political subdivision of a State that an applicant for
voting or registration for voting be free of conviction of a
felony or mental disability."  H.R. Rep. No. 89-439, reprinted in
1965 U.S.C.C.A.N. at 2457.

In drafting the VRA, Congress considered felon
disenfranchisement statutes, and it viewed them as a potential
test or device that fell within the purview of § 4 and not § 2.
We are not free to second guess Congress's categorizations of
felon disenfranchisement statutes.  Further, Congress made clear
that it did not purport to outlaw state felon disenfranchisement
statutes based on their effect.  Rather, under § 4, Congress
enumerated and outlawed tests or devices it viewed as
disqualifications excluding minority voters.  Felon
disenfranchisement laws were specifically removed from this
category by Congress and were considered nondiscriminatory.

In light of this express history, Congress could not have
intended to create a cause of action under § 2 of the VRA against
disenfranchisement of incarcerated felons while saying explicitly

-27-

elsewhere that it did not intend to proscribe any such laws. Other courts agree with our conclusion. Hayden, 449 F.3d at 319 ("[I]t is apparent to us that Congress's effort to highlight the exclusion of felon disenfranchisement laws from a VRA provision that otherwise would likely be read to invalidate such laws is indicative of its broader intention to exclude such laws from the reach of the statute."); see also Farrakhan, 359 F.3d at 1120-21 (Kozinski, J., dissenting from denial of reh'g en banc).

This point is buttressed by another aspect of § 4. As drafted in 1965, § 4 applied to covered jurisdictions.[14] Congress would not have permitted felon disenfranchisement laws in covered jurisdictions where there was a history of discrimination, while prohibiting them in non-covered jurisdictions like Massachusetts. To subject felon disenfranchisement in a non-covered jurisdiction to a VRA cause of action while prohibiting such a cause of action for a covered jurisdiction would itself raise significant constitutional concerns. See Nw. Austin, 2009 WL 1738645, at *9.

If there were any doubt as to Congress's intent not to create a cause of action against laws like Article 120, other

---

[14] Congress continued to revisit the discriminatory tests or devices banned by § 4. Later VRA amendments extended the § 4 ban on literacy tests nationwide. See Voting Rights Act Amendments of 1970, Pub. L. No. 91-285, § 201, 84 Stat. 314, 315 (current version at 42 U.S.C. § 1973aa) (extending temporary ban to entire nation); Voting Rights Act Amendments of 1975, Pub. L. No. 94-73, § 201, 89 Stat. 400, 400-01 (current version at 42 U.S.C. §§ 1973b-1973c) (making the temporary nationwide ban permanent). Congress never changed its view that felon disenfranchisement laws were not within the reach of the VRA.

actions show congressional acceptance of even broader felon disenfranchisement laws than involved here, reinforcing the conclusion that § 2 was not meant to proscribe laws such as Article 120. In 1971, just six years after passing the VRA, Congress affirmatively enacted a broader felon disenfranchisement statute covering both imprisoned and paroled felons in the District of Columbia, over which it then exercised plenary power. Act of Dec. 23, 1971, Pub. L. No. 92-220, § 4, 85 Stat. 788, 788; see also Hayden, 449 F.3d at 315. Congress would not have prohibited states from imposing such disqualifications when it imposed them itself on the District.

Further, between the passage of the VRA in 1965 and the 1982 amendments, Congress considered and rejected proposals to amend the VRA[15] to prohibit certain types of state felon disenfranchisement laws. Congress understood that the VRA, as enacted in 1965, did not permit claims against state felon disenfranchisement laws and that amendment of the VRA would be needed to permit such suits, and it declined to make those amendments. Two points are important. First, Congress rejected each those proposed amendments. Second, even those rejected amendments would have precluded suits raising claims of

_____

[15] The 1975 Amendments to the VRA added protections for linguistic minorities and permanently banned literacy tests. 1975 Amendments §§ 203, 207, 89 Stat. at 401-02 (codified as amended at 42 U.S.C. §§ 1973b(f), 1973l(c)(3)). Nothing in those amendments indicated any intent to broaden the VRA to permit suits against state laws disenfranchising incarcerated felons.

disenfranchisement of a "citizen [who] is confined in a correctional facility at the time of such . . . election," as does Article 120 now at issue. See Ex-Offenders Voting Rights: Hearing on H.R. 9020 Before the Subcomm. on Courts, Civil Liberties, and the Administration of Justice of the H. Comm. on the Judiciary, 93d Cong. 4 (1974).

In 1972, the House Judiciary Committee held hearings on "The Problems of the Ex-Offender." See Corrections, Part VI, Illinois: The Problems of the Ex-Offender: Hearing Before Subcomm. No. 3 of the H. Comm. on the Judiciary, 92d Cong. (1972). In response to these hearings, several prominent VRA advocates in Congress jointly introduced a bill designed "to amend the [VRA] to prohibit the States from denying the right to vote in Federal elections to former criminal offenders who have not been convicted of any offense related to voting or elections and who are not confined in a correctional institution." Hayden, 449 F.3d at 319 (emphasis added) (quoting H.R. 15,049, 92d Cong. (1972)) (internal quotation marks omitted). The bill did not result in legislation. Id.

Similarly, Congress held hearings in 1973 expressly addressing but not adopting proposed amendments to the VRA to allow challenges to felon disenfranchisement for only that category of ex-offenders who were not imprisoned.[16] See

---

[16] The proposed amendment would have authorized "the Attorney General . . . to institute in the name of the United States such

-30-

Ex-Offenders Voting Rights: Hearing on H.R. 9020, supra, 93d Cong.

1-38; see also Hayden, 449 F.3d at 319.

Plaintiffs' claim that § 2 as drafted in 1965 permits a cause of action against Article 120 fails.

### 2.         The 1982 Amendments

We reject plaintiffs' position that § 2(b), added in 1982, may not be considered in analyzing whether they have a claim under § 2(a).[17]  Furthermore, we conclude that those amendments, while altering the law as to vote dilution claims and perhaps as to other claims (which we need not decide), undercut plaintiffs' arguments that Congress intended the VRA to reach laws disenfranchising incarcerated felons.

---

actions against States . . . including actions for injunctive relief, as he may determine to be necessary to implement the purposes of this title."  Ex-Offenders Voting Rights: Hearing on H.R. 9020, supra, at 4 (quoting H.R. 9020, 93d Cong. (1973)).

[17]  Under Supreme Court and circuit precedent, we read both § 2(a) and § 2(b) together and resort to legislative history.  The text of § 2(b) is explicit that its purpose is to give content and context to the terms used in § 2(a).  The Supreme Court has interpreted both sections together.  See Bartlett, 129 S. Ct. at 1241 ("The 1982 amendments . . . added . . . § 2(b), providing a test for determining whether a § 2 violation has occurred."); Chisom, 501 U.S. at 395 ("The two purposes of the amendment [to § 2] are apparent from its text.  Section (a) adopts a results test . . . .  Section (b) provides guidance about how the results test is to be applied.").
This court's precedent also requires we read §§ 2(a) and 2(b) together and in light of history and context.  See Metts, 363 F.3d at 10 ("The Delphic language of the [1982] amendment [to § 2] can be understood only against the background of its legislative history and subsequent Supreme Court interpretation.").

-31-

The 1982 amendments did not alter the prior understanding that the VRA did not reach the disenfranchisement of currently incarcerated felons. When "Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the [administrative or judicial] interpretation given to the incorporated law, at least insofar as it affects the new statute." Lorillard v. Pons, 434 U.S. 575, 581 (1978). Nothing in the text, context,[18] or history supports plaintiffs' position.

The Supreme Court held that "Congress amended § 2 of the VRA to make clear that certain practices and procedures that result in the denial or abridgement of the right to vote are forbidden even though the absence of proof of discriminatory intent protects them from constitutional challenge." Chisom, 501 U.S. at 383-84 (emphasis added); Johnson, 405 F.3d at 1228. Felon disqualification was not among those certain practices and procedures.

---

[18]    The context of the 1982 amendments confirms our understanding that § 2 was not amended in isolation from the rest of the statute and must be read in conjunction with the other sections, including § 4. The 1982 amendments to § 2 arose in the wake of Bolden because § 5 of the VRA was scheduled for reauthorization in that year by the terms of the 1975 VRA amendments. S. Issacharoff et al., The Law of Democracy 713-14 (rev. 2d ed. 2002). Indeed, in the House, most debate focused on the structure of the preclearance and bailout provisions of the VRA, while less attention focused on the § 2 amendments. Id. at 716; see also T.M. Boyd & S.J. Markman, The 1982 Amendments to the Voting Rights Act: A Legislative History, 40 Wash. & Lee L. Rev. 1347 (1983).

Plaintiffs admirably admit that Congress's specific purpose in amending § 2 of the VRA[19] was to overrule certain aspects of the Supreme Court's decision in Bolden, which was concerned with vote dilution claims, not direct denial claims. We explain. Prior to Bolden, in White v. Regester, 412 U.S. 755 (1973), minority plaintiffs had successfully challenged a state districting plan on vote dilution grounds. There, the Court did not require a showing of discriminatory intent. See id. at 766. By contrast, the Bolden plurality held that state action "that is racially neutral on its face violates the Fifteenth Amendment only if motivated by a discriminatory purpose," 446 U.S. at 61, and altered the White evidentiary standard in vote dilution cases to

_____

[19] Congress was clear about its intent. The Senate Report states:

> This Amendment is designed to make clear that proof of discriminatory intent is not required to establish a violation of Section 2. It thereby restores the legal standards, based on the controlling Supreme Court precedents, which applied in voting discrimination claims prior to the litigation involved in Mobile v. Bolden. The amendment also adds a new subsection to Section 2 which delineates the legal standards under the results test by codifying the leading pre-Bolden vote dilution case, White v. Regester.See S. Rep. No. 97-417, at 2, reprinted in 1982 U.S.C.C.A.N. 177, 179; see also id. at 27, reprinted in 1982 U.S.C.C.A.N. at 205 ("The 'results' standard is meant to restore the pre-Mobile legal standard which governed [vote dilution cases].").

require direct evidence of discriminatory intent.[20]  See Bartlett, 129 S. Ct. at 1240-41.

In 1982, Congress focused on reversing this aspect of Bolden and clarifying the standard for vote dilution claims. Congress aimed to reinstate the "results test," which had been the rule developed in the pre-Bolden case law for vote dilution claims under White.  See Metts, 363 F.3d at 10 (stating the 1982 amendments made it clear that "discriminatory intent is not a necessary element in a violation and that Congress [instead] intended a broad range of factors to be taken into account").  But the reinstated, multifactored results test was not meant to extend to this limited felon disenfranchisement claim any more than the pre-Bolden tests were.  Nothing in the legislative history of § 2(b) indicated any intent to expand the VRA to create a cause of action against a state felon disenfranchisement law such as Article 120.  To the contrary, in enacting § 2, Congress noted that it was impossible to predict the variety of means that would be used to infringe on the right to vote and that the voting rights landscape was marked by innovation in discrimination.  S. Rep. No. 89-162, at 5 (1965); S. Rep. No. 89-439, at 10.  But these concerns do not go to felon disenfranchisement, which was

---

[20]  The Bolden plurality also held that the "language of § 2 [of the VRA] no more than elaborates upon that of the Fifteenth Amendment, and the sparse legislative history of § 2 makes clear that it was intended to have an effect no different from that of the Fifteenth Amendment itself."  446 U.S. at 61.

neither a new innovation nor a predictable future innovation. Felon disenfranchisement was a well-known and accepted part of the voting landscape. "The Senate Report, which details many discriminatory techniques used by certain jurisdictions, made no mention of felon disenfranchisement provisions." Johnson, 405 F.3d at 1234; see also Tokaji, supra, at 707 ("The legislative history of the 1982 amendments thus shows that Congress was almost exclusively focused on vote dilution claims.").[21]

Further, the language of § 2(b) undercuts plaintiffs' assertion they have stated a claim under § 2(a). The text of subsection (b) protects a "class of citizens" who by law may and should enjoy as full an "opportunity [as] other members of the electorate to participate in the political process." § 1973(b). For a host of valid reasons, incarcerated prisoners cannot participate in the political process equally with free citizens outside the prison walls. Hayden, 449 F.3d at 342 (Jacobs, J., concurring). As noted by Hayden, "There is no question that incarcerated persons cannot 'fully participate in the political process' -- they cannot petition, protest, campaign, travel, freely associate, or raise funds." Id. at 321.

Further, the 1982 Congress amended § 2 to assuage expressed fears that the courts would interpret a results test as

---

[21] We need not reach the question of whether this amendment was meant to reach other types of § 2 claims than vote dilution claims; even if so, the amendments were not meant to create a cause of action against imprisoned felon disenfranchisement laws.

a requirement for proportional representation in vote dilution cases, and therefore the statute was amended to expressly disclaim any right to proportional representation. § 1973(b) ("[N]othing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."); Tokaji, supra, at 705-06. This suggests that Congress was fundamentally concerned with remedying discrimination in voting, rather than guaranteeing proportionality in political representation. See, e.g., S. Issacharoff, Polarized Voting and the Political Process, 90 Mich. L. Rev. 1833 (1992). Plaintiffs' claim, which is based on mere disproportionality in the prison population from felon disenfranchisement, does not implicate these concerns.

3.        Post-1982 Congressional Actions Assume the Validity of State and Federal Felon Disenfranchisement Laws

Congressional action, both after 1982 and in the aftermath of Bush v. Gore, also undercuts the plaintiffs' reading of the amended § 2 to support a claim against imprisoned felon disenfranchisement laws. These statutes show continuing congressional approval of state laws disenfranchising imprisoned felons. The National Voter Registration Act of 1993, which generally restricts states' ability to remove names from the voter rolls, explicitly exempts state decisions to disenfranchise individuals "by reason of criminal conviction." 42 U.S.C. § 1973gg-6(a)(3)(B). The Help America Vote Act of 2002 directs

states to remove disenfranchised felons from their lists of those eligible to vote in federal elections. 42 U.S.C. § 15483(a)(2)(A)(ii)(I). These two recent statutes are entirely inconsistent with reading § 2, whatever its breadth, to create a cause of action against Article 120.

Further, Congress has continued to consider and reject numerous proposals to require states to enfranchise even former felons. Even these efforts have expressly excluded currently incarcerated felons. See, e.g., Civic Participation and Rehabilitation Act of 1999: Hearing on H.R. 906 Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary, 106th Cong. 1, 3 (2000) (quoting H.R. 906, 106th Cong. (1999)).[22]

Congress has excepted from the reach of the VRA protections from vote denial for claims against a state which disenfranchises incarcerated felons. We do not need to decide[23]

---

[22] The Civic Participation and Rehabilitation Act would have restored the voting rights of ex-felons, but not imprisoned felons, in federal elections. H.R. 906 was not drafted as an amendment to the VRA, but contained a savings clause clarifying that the measure operated in addition the VRA and the National Voter Registration Act. Civic Participation and Rehabilitation Act of 1999: Hearing on H.R. 906, supra, at 4. A number of recent unsuccessful bills are consistent with H.R. 906's proposal to restore the rights of only former felons. And even these have been flatly rejected by Congress. See, e.g., Democracy Restoration Act of 2008, S. 3640, 110th Cong. (2008); Democracy Restoration Act of 2008, H.R. 7136, 110th Cong. (2008); Count Every Vote Act of 2005, S. 450, 109th Cong. (2005); Ex-Offenders Voting Rights Act of 2005, H.R. 663, 109th Cong. (2005).

[23] It is doubtful plaintiffs have articulated a viable § 2 direct denial theory, in any event. Plaintiffs have explained only that they think this claim falls within a broad reading of § 2,

what is needed to prove a denial (as opposed to a dilution) claim under § 2 which is not a claim against a state provision disenfranchising imprisoned felons.[24]

provided one ignores the text of § 4, the legislative history of the Act, and the purpose and context of § 2(b).  But they have not explained even what their theory of liability is, what standards a court would apply, or what the components of a winning claim would be.  This is the situation eight years after they filed suit and have had discovery from defendants.

       The most plaintiffs have suggested is that despite the self-evident racial neutrality of depriving all incarcerated felons from voting while imprisoned, there may be some causal connection between being incarcerated for felonies and their race.  But the very 1994 Commission Report on which they rely concludes that no such connection was shown.  More than that, it concluded that if one wished to see if such a connection could be shown, the data simply did not exist to permit the testing of the hypothesis.  When plaintiffs asked the defendant officials in discovery for data which would presumably assist them, the defendants said they did not have and did not keep such data.

       There is nothing else.  Even if one were to look more broadly at the Senate factors so often used in vote dilution cases, see S. Rep. No. 97-417, at 28-29 (1982), reprinted in 1982 U.S.C.C.A.N. 177, 206-07, those factors do not aid plaintiffs.

       Further, given our disposition of the case, we need not reach the concerns raised by Judge Kozinski about the role of evidence of statistical disparities in § 2 challenges.  Farrakhan, 359 F.3d at 1119 (Kozinski, J. dissenting from denial of reh'g en banc); see also Ricci v. DeStefano, No. 07-1428, --- S.Ct. ----, 2009 WL 1835138, at *19 (June 29, 2009) (reliance on threshold showing of a raw statistical disparity in test results is not strong evidence of disparate impact).

       [24] Some have commented on a "potential tension in the case law [because] . . . section 2 [from 1982 onward] had been used almost entirely for vote dilution claims [while] [t]he felon disenfranchisement cases involve an older kind of claim involving access to the ballot itself; such cases involve not vote dilution but vote denial." S. Issacharoff et al., The Law of Democracy 140 (rev. 2d ed. Supp. 2006); see Tokaji, supra, at 709 ("While Gingles and its progeny have generated a well-established standard for vote dilution, a satisfactory test for vote denial cases under Section 2 has yet to emerge. . . . [and] the Supreme Court's seminal opinion in Gingles . . . is of little use in vote denial cases."); Karlan, supra, at 122 (["T]he second generation of voting rights

Given the historic legitimacy of felon disenfranchisement, the constitutional recognition of the authority of states to disenfranchise imprisoned felons, the congressional recognition of that authority and the express congressional statements that the VRA was not meant to proscribe that authority, this is not the case in which to test the standards for other types of purported direct disenfranchisement claims.  While our emphasis is somewhat different, we agree with the Second Circuit in <u>Hayden</u> that the seven circumstances it identifies all necessitate the conclusion that the this claim is not actionable.  449 F.3d at 315-16.

Plaintiffs have failed to state a claim under VRA § 2.  We have no need to reach the serious constitutional questions which the Commonwealth argues would be raised were we to adopt plaintiffs' construction of the statute.  In <u>Northwest Austin</u>, the Supreme Court emphasized the principle that courts, particularly in VRA cases, should avoid deciding constitutional issues where statutory interpretation obviates the issue, as here.  <u>Nw. Austin</u>, 2009 WL 1738645 at *4 ("Our usual practice is to avoid the unnecessary resolution of constitutional questions.); <u>see</u> <u>also</u> <u>Hayden</u>, 449 F.3d at 328 n.24; <u>Johnson</u>, 405 F.3d at 1230.

---

activity address the problem of racial vote dilution rather than outright disenfranchisement."); A.A. Peacock, <u>From Beer to Eternity</u>, <u>in</u> <u>Redistricting in the New Millennium</u> 119, 125 (P.F. Galderisi ed., 2005) 119, 125 (same).

III.

<u>EX POST FACTO CLAUSE CLAIM</u>

We turn to plaintiffs' appeal from the district court's grant of summary judgment in favor of the Commonwealth on the Ex Post Facto Clause arguments. There are no material facts in dispute in the record.

Plaintiffs argue the Ex Post Facto Clause was violated because "the only plainly discernible purpose for Article 120 was to seek to impose an additional measure of punishment upon those who had violated the laws of the Commonwealth." Plaintiffs point to the a transcript of the debates at the 1998 and 2000 Constitutional Conventions over the bill that ultimately became Article 120. Plaintiffs also rely on language from Acting Governor Cellucci's proposed amendment and his statements to the public, an amendment which was not accepted. These statements include: "The time has come to tell would-be criminals in Massachusetts that committing crimes has serious consequences," and that "[p]risons are a place for punishment." Even though his initial proposal was never in fact acted on by the legislature, we consider his comments as part of the background.

Analysis of the Ex Post Facto Clause claim involves a two-part inquiry. The first asks whether the denial of the right to vote is a civil, regulatory measure within the meaning of the caselaw, or whether it is punitive. "[W]here unpleasant

consequences are brought to bear upon an individual for prior conduct," the central question "is whether the legislative aim was to punish that individual for past activity, or whether the restriction of the individual comes about as a relevant incident to a regulation of a present situation." De Veau v. Braisted, 363 U.S. 144, 160 (1960) (holding that state statutory bans against employment of convicted felons in certain jobs did not impose punishment under Ex Post Facto Clause). Only a punitive measure can violate the Ex Post Facto Clause. See, e.g., Smith v. Doe, 538 U.S. 84, 92 (2003); see also United States v. Salerno, 481 U.S. 739 (1987) (holding preventative detention under the Bail Reform Act was permissible because it was regulatory and preventative, rather than punitive).

The Supreme Court has stated that felon disenfranchisement provisions are considered regulatory rather then punitive. In Trop v. Dulles, 356 U.S. 86 (1958), the Court explained:

> [A] statute has been considered nonpenal if it imposes a disability, not to punish, but to accomplish some other legitimate governmental purpose. . . . The point may be illustrated by the situation of an ordinary felon. A person who commits a bank robbery, for instance, loses his right to liberty and often his right to vote. If, in the exercise of the power to protect banks, both sanctions were imposed for the purpose of punishing bank robbers, the statutes authorizing both disabilities would be penal. But because the purpose of the latter statute is to designate a reasonable ground of eligibility for voting, this law is

> sustained as a nonpenal exercise of the power
> to regulate the franchise.

Id. at 96-97; see also Lassiter v. N. Hampton County Bd. of Elections, 360 U.S. 45, 51 (1959) (criminal record is an "obvious" factor that "a State may take into consideration in determining the qualifications of voters").  Article 120 is no exception.

Even if the Supreme Court had not already described such regulation of the franchise with respect to incarcerated felons as nonpenal, we would still find Article 120 to be a civil regulatory scheme.  In examining Article 120 "on its face," Hudson v. United States, 522 U.S. 93, 100 (1997), there is no language indicating the Commonwealth's provision is penal.  Article 120 is not in the Commonwealth's criminal code, but rather its civil constitutional and statutory voter qualification provisions.  See Hendricks, 521 U.S. at 361, ("[The State's] objective to create a civil proceeding is evidenced by its placement of the Act within the [State's] probate code, instead of the criminal code" (citations omitted)).  Article 120 also disenfranchises persons under guardianship, persons disqualified because of corrupt elections practices, and all persons under eighteen years of age, as well as incarcerated felons.  And the disqualification is enforced civilly, not criminally.

Article 120 does not involve a more general period of disenfranchisement because of commission of a felony; rather Article 120 is limited to the period of incarceration.  Article 120 thus creates a temporary qualification on the right to vote coincident

-42-

with imprisonment, rather than a long-term consequence for the commission of a crime.

Article 120 is a constitutional amendment, which was later effectuated and extended by statute. The voters of Massachusetts ratified Article 120 in a statewide election. The Voter Guide read by the voters, which we described earlier, made no mention of any goal of punishing prisoners. "The Ex Post Facto Clause does not preclude a State from making reasonable categorical judgments that conviction of specified crimes should entail particular regulatory consequences." Smith, 538 U.S. at 1153.

Secondly, even if the legislature intended to deem a particular law "civil," courts must further inquire whether "the statutory scheme was so punitive either in purpose or effect as to negate that intention." United States v. Ward, 448 U.S. 242, 248-49 (1980). "'[O]nly the clearest proof' will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." Hudson, 522 U.S. at 100 (quoting Ward, 448 U.S. at 249). Plaintiffs fail to meet this standard.

We review whether plaintiffs' allegations of punitive purpose meet the non-exclusive factors test set forth in Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69 (1963), and followed in Smith, 538 U.S. at 97.

The Mendoza-Martinez factors are: (1) whether the sanction involves an affirmative disability or restraint; (2)

-43-

whether it has historically been regarded as punishment; (3) whether it comes into play only on a finding of scienter; (4) whether its operation will promote the traditional aims of punishment -- retribution and deterrence; (5) whether the behavior to which it applies is already a crime; (6) whether there is a rational connection to a nonpunitive purpose; and (7) whether it appears excessive in relation to the alternative purpose assigned. Mendoza-Martinez, 372 U.S. at 168-69. The most relevant factors are whether felon disenfranchisement "has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose." Smith, 538 U.S. at 97.

First, Article 120 does not impose any affirmative disability or restraint, physical or otherwise. See Smith, 538 U.S. at 100 ("[I]mprisonment . . . is the paradigmatic affirmative disability or restraint."). Disenfranchisement during the period of incarceration imposes no additional term of imprisonment, see Flemming v. Nestor, 363 U.S. 603, 617 (1960), and is not as enduring as permanent occupational debarment, which the Court has held is nonpunitive. Hudson, 522 U.S. at 104; De Veau, 363 U.S. at 144; Hawker v. New York, 170 U.S. 189 (1898) (revocation of a medical license does not violate Ex Post Facto clause).

Second, felon disenfranchisement has historically not been regarded as punitive in the United States, as the Supreme Court indicated in Trop v. Dulles. Indeed, in holding that felon disenfranchisement has "affirmative sanction" in § 2 of the Fourteenth Amendment of the U.S. Constitution, Richardson, 418 U.S. at 54, the Supreme Court noted the historical prevalence of state felon disenfranchisement laws and never characterized even California's broad disqualification of former felons as punitive. Id. at 55.

As to the third and fifth factors, Article 120 is effective regardless of a finding of scienter or the type of crime so long as it is a felony. That Article 120 may be "tied to criminal activity" is "insufficient to render the statut[e] punitive." United States v. Ursery, 518 U.S. 267, 291 (1996).

The fourth Mendoza-Martinez factor considers whether felon disenfranchisement will promote the traditional aims of punishment, retribution and deterrence, to see whether plaintiffs have offered the clearest proof to overcome the statement of nonpenal purpose. Plaintiffs rely on some statements made by some legislators that could be viewed as retributive, such as that felons "don't deserve to vote." To the extent the legislators' comments are relevant, they are sporadic and do not clearly evince a retributive purpose. More significantly, since Article 120 was put before the voters, the Information for Voters Guide is a better

-45-

source of context.  The Guide contained a balanced debate about the merits of allowing currently incarcerated felons to vote in state elections, noted the problem of prisoners being able to affect the laws under which they were confined by voting, and nowhere suggests an intent to punish prisoners.

As to the sixth factor, there is an obvious rational nonpunitive purpose for disenfranchisement:  as the Guide shows, voters were concerned about the influence of currently incarcerated felons in "exercis[ing] control over [their] lives by voting from prison."  See also Smith, 538 U.S. at 1147 (noting that "even if the objective of the Act is consistent with the purposes of the [state] criminal justice system, the State's pursuit of it in a regulatory scheme does not make the objective punitive.").  Finally, Article 120 is not excessive in accomplishing this purpose.  Article 120 does not violate the Ex Post Facto Clause.

IV.

The entry of judgment against the plaintiffs' Ex Post Facto Clause claim is affirmed; the court's denial of the motion to dismiss the VRA claim is reversed and the case is remanded to the district court for dismissal of both claims with prejudice.  Each side shall bear its own costs.

So ordered.

**-Dissenting Opinion Follows-**

**TORRUELLA**, <u>Circuit Judge</u> (Dissenting). Lest we be misled by the majority's choice of emphasis, this is <u>not</u> a case about the state's authority to disenfranchise convicted felons, nor about the popularity or desirability of that practice. Were that the issue before us, I too would be in the majority, as the validity of felon disenfranchisement laws, as a general matter, has been established. <u>See</u> <u>Richardson</u> v. <u>Ramirez</u>, 418 U.S. 24, 56 (1974). Moreover, were that the issue before us, it would not have spawned reams of conflicting opinions, vigorous dissents and en banc reversals among our sister circuits.[25]

Rather this is a case about interpreting a clearly worded congressional statute, the Voting Rights Act of 1965 ("VRA"), according to its terms, when there is no persuasive reason to do otherwise. <u>Nw. Austin Mun. Util. Dist. No. One</u> v. <u>Holder</u>, 557 U.S. ____ (2009), 2009 WL 1738645 at *9 ("The Fifteenth Amendment

---

[25] <u>Compare</u> <u>Farrakhan</u> v. <u>Washington</u>, 338 F.3d 1009 (9th Cir. 2003) (holding that § 2 of the VRA applies to felon disenfranchisement statutes); <u>Johnson</u> v. <u>Governor of Fla.</u>, 353 F.3d 1287 (11th Cir. 2003) (same); <u>Baker</u> v. <u>Cuomo</u>, 58 F.3d 814 (2d Cir. 1995) (same); <u>Howard</u> v. <u>Gilmore</u>, No. 99-2285, 2000 WL 203984, at *1 (4th Cir. Feb. 23, 2000)(assuming without expressly deciding that § 2 of the VRA applies to felon disenfranchisement laws and evaluating plaintiff's vote dilution claim thereunder); <u>Wesley</u> v. <u>Collins</u>, 791 F.2d 1255 (6th Cir. 1986) (same) <u>with</u> <u>Hayden</u> v. <u>Pataki</u>, 449 F.3d 305 (2d Cir. 2006) (en banc) (reversing its previous decision and denying coverage under the § 2 of the VRA for felon disenfranchisement statutes); <u>Johnson</u> v. <u>Governor of Fla.</u>, 405 F.3d 1214 (11th Cir. 2005) (en banc) (same); <u>Baker</u> v. <u>Pataki</u>, 85 F.3d 919 (2d Cir. 1996) (en banc) (dividing evenly on the question of whether felon disenfranchisement claim can proceed under § 2 the VRA, thus reinstating the district court decision dismissing the claim).

empowers 'Congress,' not the [c]ourt[s], to determine in the first instance what legislation is needed to enforce it."). It is also a case about the constitutional validity of altering the legal consequences for committing a crime, long after the crime's completion. Because I disagree with the majority's resolution of both of these novel issues, I respectfully dissent.

## I. Voting Rights Act Claim

Section 2 of the VRA, as amended in 1982, plainly provides that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State . . . in a manner which results in a denial or abridgement of the right . . . to vote on account of race or color . . . ." 42 U.S.C. § 1973(2)(a) (emphasis added); see also Nw. Austin, 557 U.S. at ____, 2009 WL 1738645 at *4. Notably, § 2(a) employs a "'results'" test, under which proof of discriminatory intent is not necessary to establish a violation of the section. Chisom v. Roemer, 501 U.S. 380, 395 (1991). Rather, plaintiffs can state a § 2 claim by showing that under the "totality of circumstances," a "certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." Thornburg v. Gingles, 478 U.S. 30, 43-

44 (1986).[26]  The allegations in plaintiffs' complaint, which we must accept as true at this preliminary stage, see Pérez-Acevedo v. Rivero-Cubano, 520 F.3d 26, 29 (1st Cir. 2008), are that Massachusetts' Article 120, which disqualifies incarcerated felons from voting in the Commonwealth, has a disproportionately adverse effect on the voting rights of African-Americans and Hispanic-Americans, who are over-represented in the incarcerated felon population.  Plaintiffs allege that this disparate impact is caused, in part, by racial and ethnic bias in the Massachusetts court system, and operates to deny these racial minorities the right to vote, in violation of § 2 of the VRA.  Plaintiffs further allege

---

[26] Among the non-exhaustive factors listed by the Senate as relevant to assessing the validity of a voter qualification is "the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process."  S. Rep. No. 94-417, at 29 (1982), as reprinted in 1982 U.S.C.C.A.N. 177, 207.  The ultimate inquiry, according to the Senate Report is "whether, in the particular situation, the practice operated to deny the minority plaintiff an equal opportunity to participate and to elect candidates of their [sic] choice." Id. at 30.  The Ninth Circuit, applying this test, has explicitly held that evidence of racial bias in the criminal justice system is a relevant "social and historical condition" for purposes of the totality of the circumstances test, reasoning that "such discrimination would clearly hinder the ability of racial minorities to participate effectively in the political process as disenfranchisement is automatic." Farrakhan, 338 F.3d at 1020; see also Nipper v. Smith, 39 F.3d 1494, 1513-14 (11th Cir. 1994) (en banc) (holding that the existence of racial bias in the community is relevant to a § 2 claim).  "Thus, racial bias in the criminal justice system may very well interact with voter disqualifications to create the kinds of barriers to political participation on account of race that are prohibited by Section 2."  Farrakhan, 338 F.3d at 1020.

that when enacting Article 120, Massachusetts legislators were aware of the data regarding racial bias in the criminal justice system.[27]

The felon disenfranchisement provision at issue is clearly a "voting qualification."  Whether or not this provision results in the denial of the right to vote "on account of race or color" under the "totality of the circumstances" remains the ultimate question for the trier of fact.  But "[e]ven if serious problems lie ahead in applying the 'totality of the circumstances standard described in [VRA] § 2(b), that task, difficult as it may prove to be, cannot justify a judicially created limitation on the coverage of the broadly worded statute, as enacted and amended by Congress." Chisom, 501 U.S. at 403.  Plaintiffs have stated a claim sufficient to preclude dismissal at this preliminary stage and are entitled to the opportunity to develop it.

In order to avoid this obvious result, the majority makes an expansive and unwarranted holding.  It holds that despite the broad language of VRA § 2, covering all "voting qualifications," Congress actually never intended for felon disenfranchisement laws, even discriminatory ones, to be challengeable under that provision.

---

[27]  Notably, bearing on the question of plausibility of plaintiffs' claim, one scholar has found that an analysis of the factors inducing states to impose or eliminate felon disenfranchisement provisions concluded that "[s]tates with greater nonwhite prison populations have been more likely to ban convicted felons from voting than states with proportionally fewer non-whites in the criminal justice system." Angela Behrens, et al., Ballot Manipulation and the "Menace of Negro Domination": Racial Threat and Felon Disenfranchisement in the United States, 1850-2002, 109 Am. J. Soc. 559, 596 (2003).

It does so by disregarding the plain and unambiguous text of the statute and resorting to a collection of secondary evidence, none of which stand for the proposition the majority seeks to establish. In the face of so startling a holding, I am left wondering, in the words of Judge Calabresi, "[w]hat is behind this remarkable decision to buck text, context, and legislative history in order to insulate a particular racially discriminatory practice from an anti-discrimination rule of general applicability?" Hayden, 449 F.3d at 365 (Calabresi, J., dissenting).

The fatal flaw in the majority's reasoning begins with its improper reliance on legislative history given the plain and unambiguous language of § 2(a), the section of the VRA governing the central "applicability" question before us. See Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997) ("Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." (emphasis added)). The plain language of § 2(a) unambiguously applies to all "voting qualifications." 42 U.S.C. § 1973. A provision disqualifying incarcerated felons, listed among the provisions of the Massachusetts Constitution governing qualifications to vote, clearly constitutes a "voting qualification." Therefore, where it is alleged, as here, that this "qualification" is being applied "in a manner which results" in the denial of the right to vote on account of race, a cognizable VRA

-51-

claim has been stated.  Id.  As the text of the statute unambiguously manifests its meaning, there was no need to go any further in order to conclude that plaintiffs have stated a cognizable claim under § 2 of the VRA.

This is the reasoning upon which the Ninth Circuit decision, holding that an identical VRA claim had been stated in that Circuit, starts and ends.  See Farrakhan, 338 F.3d at 1016 ("Plaintiff's claim of vote denial [resulting from Washington's felon disenfranchisement law] is cognizable under Section 2 of the VRA" because '[f]elon disenfranchisement is a voting qualification, and Section 2 is clear that any voting qualification that denies citizens the right to vote in a discriminatory manner violates the VRA (emphasis added))."[28]  As Judge Sotomayor similarly explained in her powerful dissenting opinion in Hayden:

> It is plain to anyone reading the Voting Rights Act that it applies to all 'voting qualifications.' And it is equally plain that [the felon disenfranchisement provision at issue] disqualifies a group of people from voting.  These two propositions should constitute the entirety of our analysis.

---

[28]  The majority attempts to distinguish Farrakhan on the ground that the Washington provision at issue in that case was "not as narrow as this one."  I, however, see no meaningful difference between disenfranchising felons until the completion of their sentences as under the Washington statute, or only while incarcerated, as in the case before us.  In any event, the narrowness or breadth of a particular felon disenfranchisement scheme bears no relevance upon the question of whether challenges to these types of laws are cognizable under the VRA.

449 F.3d at 367-68; see also Johnson, 405 F.3d at 1247 (Barkett, J., dissenting) ("[Plaintiffs'] contention that Florida's felon disenfranchisement law effectively denies their right to vote because they are black is clearly encompassed by the plain language of the VRA.").

The majority cannot dispute "the traditional rule that where the plain text of the statute is unmistakably clear on its face, there is no need to discuss legislative history." Succar v. Ashcroft, 394 F.3d 8, 31 (1st Cir. 2005) (Lynch, J.) (quoting Sutton v. United Air Lines, Inc., 527 U.S. 471, 481 (1999)). While the majority cites Nken v. Holder, 129 S. Ct. 1749 (2009) for the general proposition that statutory interpretations turns on language as well as context, id. at 1756, neither Nken nor the case upon which it relies addressed a statute whose plain meaning is as evident and clear on its face as the one before us. In fact, contrary to the majority's contention, even with complicated statutory schemes like the VRA, courts have not hesitated to rely on the plain language of the text, where the text plainly answers the very question before them. See, e.g., Lopez v. Monterey County, 525 U.S. 266, 278-79 (1999); Chisom, 501 U.S. at 396. There is simply no support in our precedent for disregarding so plain and unambiguous a statutory mandate based on nothing more than our own assumption that Congress did not mean what it said. See BedRoc Ltd., LLC, 541 U.S. at 183 (explaining that absent ambiguity we are

-53-

bound by the "preeminent canon of statutory interpretation [that] requires us to presume that [the] legislature says in a statute what it means and means in a statute what it says there" (internal quotation marks omitted)); United States v. Shreveport Grain & Elevator Co., 287 U.S. 77, 83 (1928) (quoting Hamilton v. Rathbone, 175 U.S. 414, 421 (1899) for proposition that legislative history may be resorted to in order "to solve, but not to create, an ambiguity" (emphasis added)); Ruiz v. Bally Total Fitness Holding Corp., 496 F.3d 1, 8 (1st Cir. 2007) (explaining that we "are not free to disregard the plain language of a statute and, instead, conjure up legislative purposes and intent out of thin air").

Though it is unable to point to any actual textual ambiguity, the majority nevertheless makes a conclusory assertion that "[t]he language of § 2(a) is both broad and ambiguous." Breadth, however, does not render a statute ambiguous. See BedRoc Ltd., LLC v. United States, 541 U.S. 176, 187 n.8 (2004) ("Where a law is plain and unambiguous, whether it be expressed in general or limited terms, the legislature should be intended to mean what they have plainly expressed, and consequently no room is left for construction." (emphasis added & citation omitted)); Diamond v. Chakrabarty, 447 U.S. 303, 315 (1980) ("Broad general language is not necessarily ambiguous when congressional objectives require broad terms."). Rather, "a statute is ambiguous only if it admits of more than one reasonable interpretation." United States v.

Vidal-Reyes, 562 F.3d 43, 51 (1st Cir. 2009) (quoting United States v. Godin, 534 F.3d 51, 56 (1st Cir. 2008)). But "[c]onspicuously absent from the majority opinion is so much as a hint of an intelligible reading under which [the felon disenfranchisement provision] is not a 'voting qualification or prerequisite to voting or standard, practice or procedure.' (What else on earth could [the provision] possibly be?)". Hayden, 449 F.3d at 346 (Parker, J., dissenting). There is simply no reasonable interpretation of § 2 under which a felon disenfranchisement law would not be a "voting qualification or prerequisite to voting" actionable thereunder.[29]

Given the clarity of the VRA language, which plainly encompasses the claim before us, the majority's resort to secondary sources to justify its contrary result constitutes a "radical abandonment of our longstanding precedents that permit resort to legislative history only when necessary to interpret ambiguous statutory text." Id. at 187 n.8. I cannot endorse this impermissible practice. But even if, for the sake of argument, I take up the majority's invitation to investigate history and context, I find that none of the evidence cited by the majority

---

[29] We acknowledge that § 2(b) of the VRA, containing a "totality of the circumstances" test for proving a violation of § 2(a), may require further interpretation. However, any ambiguity in § 2(b) is irrelevant to whether a felon disenfranchisement provision is a voting qualification governed by the Act - a question which the plain language of § 2(a) unambiguously answers in the affirmative. See Robinson, 519 U.S. at 340 (identifying the relevant question as "whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." (emphasis added)).

indicates congressional intent to exclude felon disenfranchisement laws from § 2's purview so as to justify departing from the plain language of that provision.  In fact, my reading of the legislative history is that it <u>confirms</u> the plain meaning of the text.

One need not delve too deeply into the legislative history to discover that Congress enacted the Voting Rights Act of 1965 pursuant to its powers to enforce the Fifteenth Amendment for the "broad remedial purpose of 'rid[ding] the country of racial discrimination in voting.'" <u>Chisom</u>, 501 U.S. at 403 (quoting <u>South Carolina</u> v. <u>Katzenbach</u>, 383 U.S. 301, 315 (1966)); <u>see also</u> <u>Nw. Austin</u>, 557 U.S. at ____, 2009 WL 1738645, at *4-5.[30]  At that time, although the Fifteenth Amendment guaranteeing the right to vote without regard to race or color had been in effect for nearly a hundred years, and thus, intentional discrimination was already prohibited, states continued to devise facially "neutral" devices such as gerrymandering, poll taxes, literacy tests and grandfather clauses, which, coupled with violence and intimidation, served to effectively bar minorities from access to the polls and preclude the Fifteenth Amendment's promise of racial equality in voting from becoming a reality.  <u>See</u> <u>Nw. Austin</u>, 557 U.S. at ____, 2009 WL 1738645, at *4-5 (describing "the first century of congressional

_____

[30]  Notably, despite its insistence on resorting to secondary sources to ascertain congressional intent, the majority places curiously little emphasis on the historical and policy considerations that prompted Congress to pass into law the very statute whose meaning it endeavors to ascertain.

-56-

enforcement of the [Fifteenth] Amendment" as a "failure" and noting the "creativ[ity] [of states] in 'contriving new rules' to continue violating the Fifteenth Amendment" (quoting Katzenbach, 383 U.S. at 335); Andrew L. Shapiro, Note, Challenging Criminal Disenfranchisement Under the Voting Rights Act: A New Strategy, 103 Yale L. J. 537, 543 (1993). Accordingly, the text of the original § 2 "tracked, in part, the text of the Fifteenth Amendment." Bartlett v. Strickland, 129 S. Ct. 1231, 1240 (2009). While the legislative history of § 2 of the VRA is silent on the particular question of felon disenfranchisement, that history does clearly indicate that Congress intentionally kept § 2(a) as broad as possible because it found it "impossible to predict the variety of means that would be used to infringe on the right to vote" and wanted to encompass all such measures that states could devise. Johnson, 405 F.3d at 1243 (Wilson, J., concurring in part and dissenting in part); see also Katzenbach, 383 U.S. at 335 (noting that "Congress knew that some of the States . . . had resorted to the extraordinary stratagem of contriving new rules of various kinds for the sole purpose of perpetuating voting discrimination in the face of adverse federal court decrees" and that "Congress had reason to suppose that these States might try similar maneuvers in the future"); H.R. Rep. 89-439, at 10 (1965), reprinted in 1965 U.S.C.C.A.N. 2437 (1965) (describing how, "even after defeat resisters s[ought] new ways and means of discriminating," and, as

-57-

a result, rejected the case by case approach that "too often ha[d] caused no change in result, only in methods."). Thus, Congress intentionally chose the expansive language "voting qualifications or prerequisite to voting, or standard, practice, or procedure" for § 2 so as to be "all-inclusive of any kind of practice" that might be used by states to deny citizens that right. Allen v. State Bd. of Elections, 393 U.S. 544, 566-67 (1969) (citing testimony from Senate Judiciary Committee Hearings on the VRA).[31] As the Supreme Court has held, Congress intended the term "voting qualification" in § 2 to have the "broadest possible scope" and to reach "any state enactment which altered the election of a covered State in even a minor way." Id., 393 U.S. at 566-67.[32]

---

[31] Indicative of Congress's intent to give this prophylactic statute the broadest possible scope, it is notable that an earlier draft of § 2(a) used the slightly narrower language "qualification or procedure," but during Senate Hearings on the bill, one Senator expressed concern that the word 'procedure' was not broad enough to cover all the various practices that might effectively be employed to deny citizens their right to vote. See Allen, 393 U.S. at 566-67 & n.8 (citing legislative history). In response, the Attorney General said he had no objection to expanding the language of the section, to be all-inclusive. Id. Congress then expanded the language in the final version of § 2 to include any "'voting qualifications or prerequisite to voting, or standard, practice, or procedure.'" Id. (quoting 42 U.S.C. § 1973 (1964)).

[32] In fact, in his concurrence in Holder v. Hall, Justice Thomas acknowledged that § 2 of the VRA was broadly phrased "with an eye to eliminating the possibility of evasion." 512 U.S. 874, 917 (1994) (Thomas, J., Concurring). Although Justice Thomas argued for a more restrictive interpretation of the scope of § 2 than the majority of the Supreme Court had recognized, his more restrictive interpretation of the provision was as follows:

> [T]he specific items described in § 2(a) . . . indicate that Congress was concerned in this

"Criminal disenfranchisement is an outright barrier to voting that, like the poll tax and literacy test, was adopted in some states with racially discriminatory intent and has operated throughout our nation with racially discriminatory results." Shapiro, supra, at 543.[33] Thus, these laws were precisely the type of potentially discriminatory qualification that Congress intended to subject to scrutiny under the VRA. Yet the majority definitively concludes that the VRA of 1965 was not meant to allow such an action against any felon disenfranchisement law.

---

> section with any procedure, however it might be denominated, that regulates citizens' access to the ballot – that is, any procedure that might erect a barrier to prevent the potential voter from casting his vote.

Id. (emphasis added). Surely, felon disenfranchisement laws, which outright bar a segment of the population from voting, fall into this expansive category.

[33] See also George Brooks, Comment, Felon Disenfranchisement: Law, History, Policy and Politics, 32 Fordham Urb. L.J. 851, 858 (2005) (noting that "[f]elon disenfranchisement was sometimes used as a tool by the states to disenfranchise blacks" and citing examples of states passing laws "disenfranchising those convicted of what were considered to be 'black' crimes, while those convicted of 'white' crimes did not lose their right to vote"); Virginia E. Hench, The Death of Voting Rights: The Legal Disenfranchisement of Minority Voters, 48 Case W. Res. L. Rev. 727, 738 (1998) (describing how, during Reconstruction, in an effort to prevent African-Americans from voting, several states enacted felon disenfranchisement laws and "carefully selected disenfranchising crimes in order to disqualify a disproportionate number of black voters" and noting that "many of today's laws disenfranchising felons can trace their roots to attempts by Reconstruction constitutional conventions to enact laws that would keep black voters out of the electoral process").

The majority makes much of the fact that felon disenfranchisement was not specifically mentioned in the legislative history, but "it would be a strange canon of statutory construction that would require Congress to state in committee reports or elsewhere in its deliberations that which is obvious on the face of a statute."  Harrison v. PPG Industries, Inc., 446 U.S. 578, 592 (1980).  It is also illogical to interpret silence as intent to exclude, given that the very purpose of § 2's broad language was to avoid reciting the various maneuvers that states may devise in the course of their "unremitting and ingenious defiance." Katzenbach, 383 U.S. at 309.  Rather, the VRA subjects all voting qualifications to scrutiny.  In any event, if I were to read anything into that silence, I would reach the opposite conclusion.  This is because felon disenfranchisement laws, which were undoubtedly among the mechanisms being employed by states throughout the post-reconstruction era to deprive minorities of the vote,[34] were inevitably within Congress's contemplation when drafting the VRA. Had Congress had intended to exclude this particular type of qualification from the reach of the statute, it could have done so explicitly.   But Congress made no provisos to carve felon disenfranchisement laws out from the purposely "all inclusive" language of § 2(a).  See Allen, 393 U.S. at 566.  In this historical

---

[34] See, e.g., Shapiro, supra, at 543; Brooks, supra, at 858; Hench, supra, at 738.

context, congressional silence suggests, if anything, that no such exclusion was intended.

Moreover, through the 1982 amendments to the VRA, Congress expanded the remedial power of the Act even further by relieving plaintiffs of the burden of proving discriminatory intent. Overturning a Supreme Court case that held that the original Act contained such a requirement, see Mobile v. Bolden, 446 U.S. 55, 61 (1980), Congress, through the 1982 amendments, made clear that a violation of § 2 could be established by proof of discriminatory results. See Thornburg, 478 U.S. at 43-44 (emphasis added) (reading the 1982 Amendment to the VRA as effectively overturning the Bolden requirement of showing purposeful discrimination); S. Rep. No. 97-417, at 27-28, 36-37 (1982), as reprinted in 1982 U.S.C.C.A.N. 177, 204-06, 214-15 (noting that the purpose of the Amendments was to repeal Bolden and to focus the judicial inquiry only into whether there exists equal access to electoral opportunity). Congress did so because it recognized the difficulty of proving deliberate and purposeful discrimination, and sought to ensure that "in the context of all the circumstances in the jurisdiction in question," any disparate racial impact of facially neutral voting requirements did not result from racial discrimination. S. Rep. No. 97-417 at 27. This "results test" was intended "to serve as a prophylactic against voting practices -- such as felon disenfranchisement . . . adopted or retained due to intentional discrimination that would be

-61-

difficult to prove in court."  Daniel P. Tokaji, <u>The New Vote Denial: Where Election Reform Meets the Voting Rights Act</u>, 57 S.C. L. Rev. 689, 722 (2006).  And its Report accompanying the enactment of the 1982 amendments, the Senate endorsed statements made by the Attorney General during the original VRA hearings that the purpose of "Section 2 w[as] [to] ban '<u>any kind of practice</u> . . . if its purpose or effect was to deny or abridge the right to vote on account of race or color."  S. Rep. No. 97-417, at 17 (emphasis added).  Given this history, it would be wholly incongruous with Congress's broad ameliorative intent to conclude, as does the majority, that where the particular voter qualification that results in racial discrimination happens to be a felon disenfranchisement law, in this eventuality only, does the VRA provide no relief and permit the discriminatory qualification to persist.

To reach this unlikely result, the majority relies on assorted evidence of the widespread use and general sanction of felon disenfranchisement laws in various contexts.  But all that any of this evidence actually shows is that felon disenfranchisement is not presumptively invalid, a proposition as to which, after <u>Richardson</u>, 418 U.S. at 56, there is no doubt.  None of the majority's arguments support its conclusion that Congress intended to insulate such laws from scrutiny under § 2 of the VRA where they are alleged to effect a discriminatory result.  Specifically, the evidence relied on by the majority includes (1) § 2 of the

Fourteenth Amendment, (2) the legislative history of VRA § 4, and (3) Congressional endorsement of felon disenfranchisement generally. I will address each of these sources in turn.

## A.   Section 2 of the Fourteenth Amendment

The majority suggests that felon disenfranchisement somehow differs from other voting qualifications because the "power of the states to disqualify from voting those convicted of crimes is explicitly set forth in § 2 of the Fourteenth Amendment."  But, looking at the text of that provision in context, it is by no means a grant of power to states to disenfranchise felons.  See U.S. Const. amend. XIV, § 2.  Rather, that provision simply states that disenfranchised felons, unlike other persons disenfranchised by the States, are to be included within the census for purposes of apportioning representatives.[35]

---

[35]  In relevant part, that provision states as follows:

> Representatives shall be apportioned among the several States according to their respective numbers, . . . .  But when the right to vote . . . is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.

U.S. Const. amend. XIV, § 2.

The most that can be gleaned from this language is that by addressing the eventuality of "abridg[ment] . . . for participation in . . . crime," Congress contemplated that at least in some circumstances, felon disenfranchisement could exist. Thus, it merely implies that there is no per se ban on such laws. But VRA § 2 is targeted at precisely those voting qualifications that are not the subject of a per se ban. See S. Rep. No. 97-417, at 16 (explaining that under § 2 as amended in 1982, "electoral devices . . . per se would not be subject to attack under section 2. They would only be vulnerable, if, in the totality of circumstances, they resulted in the denial of equal access to the electoral process"). As plaintiffs do not allege that felon disenfranchisement laws are unlawful per se, but only as applied in Massachusetts, where they "result in a denial . . . of the right . . . to vote on account of race," 42 U.S.C. § 1973, there is absolutely no conflict between § 2 of the Fourteenth Amendment and allowing plaintiffs to challenge disenfranchisement laws under the VRA.

In other words, that § 2 of the Fourteenth Amendment contemplates disenfranchisement as a potential qualification is unremarkable. As similarly emphasized by the majority, "[t]he criteria for eligibility to vote are defined by the states," and states have the power to fix all kinds of qualifications for voting, disqualifying felons included, but only where the exercise of that power "do[es] not contravene any restriction that Congress, acting

-64-

pursuant to its constitutional powers, has imposed." Lassiter v. Northampton County Bd. Of Elections, 360 U.S. 45, 50 (1959).[36] However, "[w]hile a State may choose to disenfranchise some, all or none of its felons based on legitimate concerns, it may not do so based upon distinctions that have the effect, whether intentional or not, of disenfranchising felons because of their race." Hayden, 449 F.3d at 346 (Parker, J., dissenting) (quoting Baker, 85 F.3d at 937); see also Farrakhan, 338 F.3d at 1016 (noting that although, as a general matter, "states may deprive felons of the right to vote without violating the Fourteenth Amendment, . . . when felon disenfranchisement results in denial of the right to vote . . . on account of race or color, Section 2 affords disenfranchised felons the means to seek redress").

## B.  Legislative History of VRA § 4

To support its contention that Congress did not intend to include felon disenfranchisement laws within the scope of VRA § 2, the majority also relies on statements in the legislative history

---

[36]  In fact, the majority's contrary interpretation of § 2 of the Fourteenth Amendment, i.e. that felon disenfranchisement is constitutionally protected and cannot be restricted, would result in a direct conflict between constitutional directives in that it is well-established that a felon disenfranchisement statute intended to discriminate against minorities are prohibited under § 1 of the Fourteenth Amendment. See Hunter v. Underwood, 471 U.S. 222, 229 (1985) (holding Alabama's disenfranchisement for commission of petty crime or misdemeanor provision unconstitutional).  The only reading of § 2 that respects the validity of Hunter and similar precedent is one that permits states to disenfranchise felons only where federal law does not otherwise preclude them from doing so.

-65-

of § 4, claiming that § 4 "would not result in the proscription of the frequent requirement of States . . . that an applicant for voting . . . be free of conviction of a felony." S. Rep. No. 89-162 (1965), as reprinted in 1965 U.S.C.C.A.N. 2508, 2562. This argument is deeply flawed. It is error to assume that a statement about one section of a statute applies to all other sections thereof. See Hayden, 449 F.3d at 352-53 (Parker, J., dissenting) (stating that legislative history of one section of an expansive statute such as VRA is "typically of no value" when attempting to understand another, entirely different, section). In fact, the Supreme Court has explicitly warned against doing so in the VRA context. Hall, 512 U.S. at 883 ("To be sure, if the structure and purpose of § 2 mirrored that of § 5, then the case for interpreting §§ 2 and 5 to have the same application in all cases would be convincing. But the two sections differ in structure, purpose, and application."). This is especially true in the case before us given that the two provisions, § 2 and § 4, "differ in structure, purpose, and application." Id. Specifically, § 4 is a provision that categorically bans, in covered jurisdictions, the use of certain facially neutral tests or devices including literacy tests, educational requirements, and "any requirement that a person as a prerequisite for voting or registration for voting . . . possess good moral character." See 42 U.S.C. § 1973b(a)(1)(A), § 1973b(c). In contrast, § 2 applies to "a broader range of practices than those

'tests and devices' defined in Section 4." Johnson, 353 F.3d at 1306 n.27. While § 4 applies only to "covered jurisdictions," and "imposes an outright ban on tests or devices," "§ 2(a), [applies nationally, and] creates a 'results' test, which requires investigating and weighing numerous factors." Hayden, 449 F.3d at 353 (Parker, J., dissenting) (internal citation omitted); see also Nw. Austin, 557 U.S. at __, 2009 WL 1738645 at *4 (distinguishing § 2 of the VRA, which "operates nationwide . . . [to] forbid[] any 'standard practice or procedure' that 'results in a denial or the abridgment of the right of any citizen . . . to vote on account of race or color'" from § 4 and the remainder of the VRA which, "[r]ather than continuing to depend on case-by-case litigation . . . directly pre-empted the most powerful tools of black disenfranchisement in the covered areas." (emphasis added & internal citations omitted)).

Thus, considering congressional statements about § 4 in the context of the provision at which they were addressed (§ 4), they signify nothing about the scope of what § 2 was intended to cover. Given § 4's absolute bar on "good moral character" tests, and the natural susceptibility of "moral character" being read as a proxy for criminal history, the statements upon which the majority relies merely clarify that the categorical bar on "good moral character" tests in § 4 should not be interpreted as also an outright ban on felon disenfranchisement. See Hayden, 449 F.3d at

-67-

364-65 (Calabresi, J., dissenting) ("[S]uch legislative statements simply make the uncontroversial point that felon disenfranchisement laws are not 'good moral character' requirements within the meaning of § 4(c)."). In contrast, "section 2 addresses voting regulations that are not per se invalid under section 4 but nonetheless result in a racially disparate impact on voting rights." Thomas G. Varnum, Let's Not Jump to Conclusions: Approaching Felon Disenfranchisement Challenges Under the Voting Rights Act, 14 Mich. J. Race & L. 109, 136 (2008). Statements regarding § 4 thus provide no indication that Congress intended to insulate felon disenfranchisement laws from scrutiny under § 2 where it is alleged that the operation of a particular law results in the denial of the right to vote on account of race. See Johnson, 405 F.3d at 1249 (Barkett, J., dissenting) (noting that decision not to add felon disenfranchisement statutes to list of per se violations does not show intent to exempt these laws from the VRA); Hayden, 449 F.3d at 365 (Calabresi, J., dissenting) ("The fact that race-neutral felon disenfranchisement is permissible under § 4(c) tells us nothing at all about whether § 2 allows racially discriminatory felon disenfranchisement." (emphasis in original)).

In support of its argument for applying § 4's legislative history to § 2, the majority suggests that, in light of § 4's limited applicability to "covered jurisdictions" with a history of discrimination, in contrast to § 2's nationwide reach, Congress

could not have "permitted" felon disenfranchisement laws in covered jurisdictions, while "prohibiting" them in non-covered jurisdictions like Massachusetts. But this argument similarly misses the mark, precisely because it mischaracterizes the statute. To be sure, the majority's argument would be persuasive if § 2 categorically "prohibit[ted]" felon disenfranchisement laws in Massachusetts and other "non-covered" jurisdictions. But it does not. See S. Rep. No. 97-417, at 16. Nor does the VRA "permit" felon disenfranchisement laws, in "covered jurisdictions," or otherwise. Rather, § 2 uniformly imposes a "totality of the circumstances" test to all "voting qualifications," anywhere in the country, prohibiting them only in the event that they result in racial discrimination. There is nothing illogical about creating a per se ban on certain presumptively discriminatory qualifications in "covered jurisdictions" only, as was done in § 4, but also permitting scrutiny of all voting qualifications nationally, including felon disenfranchisement laws, to ensure that no particular qualification is discriminatory as applied under the particular circumstances. And that is precisely what Congress did through § 2.

By exporting the legislative history of § 4 into the § 2 context, the majority ignores the very plausible interpretation that Congress intended § 2 to include felony disenfranchisement laws precisely because it chose to exclude them from § 4's list of categorically barred regulations. While Congress did not seek to

have felon disenfranchisement banned in all cases, it nevertheless intended that they be subjected, just like every other voting qualification anywhere in the country, to a "totality of the circumstances" test to assess whether they effectuate a discriminatory result. The fact that members of Congress were sufficiently cognizant of felon disenfranchisement laws to carve them out from the scope of § 4, yet made no such statements in regard to § 2, despite the intentionally broad language of that provision, indicates that Congress did not in fact intend a similar restriction in the § 2 context. See Vidal-Reyes, 562 F.3d at 53 (quoting United States v. Councilman, 418 F.3d 67, 73 (1st Cir. 2005)) ("'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'").[37] Thus, as it stands, the legislative history of § 4 shows that while Congress did not intend to enact a blanket ban on felon disenfranchisement laws as a prohibited "moral character" requirement neither did it intend to exclude discriminatory laws from the scope of VRA scrutiny.

---

[37] While this rule, known as the expressio unius est exclusio alterius canon of construction, see Councilman, 418 F.3d at 73-74, is useful for evaluating the import of omissions and inclusions in statutory text, I believe its principle is equally persuasive with respect to express omissions and inclusions in the legislative history of a statute.

## C. Historical Legitimacy and Congressional Endorsement of Felon Disenfranchisement Law

The remainder of the arguments in the majority opinion rely on Congress' sanctioning or presupposing the validity of felon disenfranchisement in various contexts, such as where (1) it has rejected proposals to outright bar felon disenfranchisement, either through the VRA or otherwise, and (2) endorsed disenfranchisement laws generally in the aftermath of the VRA. First of all, "subsequent legislative history will rarely override a reasonable interpretation of a statute that can be gleaned from its language and legislative history prior to its enactment." Solid Waste Agency of N. Cook County v. U.S. Army Corps of Eng'rs, 531 U.S. 159, 170 n.5 (2001) (quoting Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 118 n.13 (1980)). But more importantly, these arguments are entirely irrelevant to the question before us. Congressional refusal to pass categorical prohibitions on felon disenfranchisement or even its subsequent affirmation of the practice generally, is not inconsistent with Congress's clear intent to subject to scrutiny, through § 2 of the VRA, "any state enactment which altered the election law of a covered State in even a minor way." Allen, 393 U.S. at 566-67 (emphasis added). Congress may very well have decided not to bar felon disenfranchisement wholesale (as it did by omitting it from § 4) and may even have endorsed the practice where it was motivated by and served legitimate ends. But it may have nevertheless chosen, in order to make the guarantees of

the Fifteenth Amendment meaningful, to restrict the adoption of this "qualification" in those cases where it is applied "in a manner which results" in the denial of the right to vote on account of race. This reading of the legislative history, which is consistent with the statutory text, is far more compelling than the majority's analysis.

Ultimately, "the plainer the language, the more convincing contrary legislative history must be to overcome the natural purport of a statute's language." United States v. U.S. Steel Corp., 482 F.2d 439, 444 (7th Cir.), cert. denied, 414 U.S. 909 (1973). I see a clear textual mandate, uncontradicted by any legislative history, that felon disenfranchisement laws, like all voting qualifications, may be challenged under § 2 of the VRA. "If the language of law is to have any meaning at all, then surely it must prevail over the kind of speculation that is entailed in such an enterprise as th[is] court[] ha[s] undertaken." United States ex rel. Siller v. Becton Dickinson & Co., 21 F.3d 1339, 1355 (4th Cir. 1994).

The plain language of the statute being as clear as it is, and the legislative history and purpose only bolstering that clarity, I cannot help but speculate that the majority is jumping through hoops to defeat the remedial purpose for which the provision was enacted in order to produce a result consistent with its own preference in policy. But "[t]he Fifteenth Amendment empowers

'Congress,' not the [c]ourt[s], to determine in the first instance what legislation is needed to enforce it." Nw. Austin, 557 U.S. at ___, 2009 WL 1738645 at *9. And even if we "question the wisdom of Congress's decision to enact a statute that permits challenging felon disenfranchisement laws, we are judges, not policy-makers." Hayden, 449 F.3d at 348 (Parker, J., dissenting). "The duty of a judge is to follow the law, not to question its plain terms." Id., 449 F.3d at 368 (Sotomayor, J., dissenting). "I do not believe that Congress wishes us to disregard the plain language of any statute or to invent exceptions to the statutes it has created." Id.

Finally, I see no constitutional issues posed by interpreting the VRA according to its language and consistent with its purpose, so as to encompass felon disenfranchisement laws. Rather, § 2 of the VRA is firmly within the scope of Congress's power to enforce the Reconstruction amendments, which includes the power to "enact so-called prophylactic legislation that proscribes facially constitutional conduct, in order to prevent and deter unconstitutional conduct." Nev. Dep't of Human Res. v. Hibbs, 538 U.S. 721, 727-28 (2003). Finding challenges to felon disenfranchisement laws to be cognizable under the VRA, I have no trouble concluding that the plaintiffs have stated a claim sufficient to preclude dismissal at this early juncture. Thus, I would affirm the district court's decision on this issue.

-73-

## II.  Ex Post Facto Clause Claim

The second issue raised on appeal, a question of first impression in this circuit, is whether the retroactive application of a felon disenfranchisement provision violates the Ex Post Facto Clause when it is applied to felons incarcerated for crimes committed prior to the provision's passage into law.  The Ex Post Facto Clause "bars application of a law 'that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed[.]'"  Johnson v. United States, 529 U.S. 694, 699 (2000) (quoting Calder v. Bull, 3 U.S. 386, 390 (1798)); see U.S. Const. art. 1, § 10 ("No State shall . . . pass any . . . ex post facto Law.").  Plaintiffs, incarcerated in Massachusetts for offenses committed prior to Article 120's enactment, contend that Article 120 is unconstitutional as applied to them because it subjects them to additional punishment not provided for by the laws of the Commonwealth when they committed the acts underlying their convictions.  The majority affirms the dismissal of plaintiffs' claim on grounds that the deprivation of the right to vote, as accomplished by Article 120, does not constitute "punishment," and thus, falls outside the protections of the Ex Post Facto Clause.  I cannot agree.  While disenfranchising convicted felons prospectively might be perfectly constitutional, I would hold that the disenfranchisement provision here is a punitive measure, which cannot be retroactively applied.

"The deprivation of any rights, civil or political, previously enjoyed, may be punishment, the circumstances attending and the causes of the deprivation determining this fact." Cummings v. Missouri, 71 U.S. 277, 320 (1866). As the majority accurately explains, analysis of whether a particular enactment imposes retroactive punishment so as to implicate the Ex Post Facto Clause requires a two-part inquiry. The first part asks whether the challenged law has a civil, regulatory purpose, or whether it is intended to punish. See Smith v. Doe, 538 U.S. 84, 92 (2002) (citing Kansas v. Hendricks, 521 U.S. 346, 361 (1997)). If a court finds that the law was intended to be punitive, then it constitutes "punishment" for purposes of the Ex Post Facto Clause and would violate the clause if retroactively applied. Id. However, if the law conveys a non-punitive, regulatory purpose, the court moves to the second part of the test to ascertain whether the law is "so punitive either in purpose or effect as to negate [the state's] intention to deem it civil." Id. (quoting United States v. Ward, 448 U.S. 242, 248-49 (1980)). The ultimate question is "whether [Article 120] is intended to be, or by its nature necessarily is, criminal and punitive, or civil and remedial." United States v. One Assortment of 89 Firearms, 465 U.S. 354, 362 (1984).

While legislative purpose is not easily discernible given the unique procedural history of Article 120's enactment by popular referendum, I nevertheless find that a close look at the provision's

-75-

language and history reveals that it was intended by its proponents to be a primarily punitive measure. Moreover, even if the primary intent behind the enactment of Article 120 could not be clearly identified,[38] I would find this disenfranchisement law to be so punitive in effect that it nevertheless constitutes a criminal punishment under the second prong of Smith.

## A. The Legislative Intent Was Punitive

We first ask whether Article 120 was intended to be a civil or criminal measure. See Smith, 538 U.S. at 92. Determining whether Article 120 was intended to be civil or criminal "'is first of all a question of statutory construction.'" Id. (quoting Hendricks, 521 U.S. at 361). As this court has made clear, analysis of statutory construction "begin[s] with the language of the statute." Phillips v. Pembroke Real Estate, Inc., 459 F.3d 128, 139 (1st Cir. 2006) (quoting Barnhart v. Sigmon Coal Co., 534 U.S. 438, 450 (2002)). Yet, in holding that Article 120 conveys a regulatory intent, the majority again departs from this well-established framework.

The majority disposes of the first prong of Smith by citing Trop v. Dulles for the proposition that "felon

---

[38] See Gabriel J. Chin, Are Collateral Sanctions Premised on Conduct or Conviction?, 30 Fordham Urb. L.J. 1685, 1686 (2003) (opining that "it is not always clear that the primary legislative motivation for a collateral sanction is civil rather than punitive, nor is it always a simple matter to discern the primary motivation").

disenfranchisement provisions are considered regulatory rather then punitive." See 356 U.S. 86, 94 (1958). But leaving aside the merits of this proposition for the moment, the fact that disenfranchisement provisions are generally considered regulatory rather than punitive is not dispositive of what the Massachusetts voters and legislators intended here. Rather, the relevant questions are what Article 120's particular language says and if there are any inferences that can be drawn from its broader structure. See Smith, 538 U.S. at 92 (instructing that we should first "consider the statute's text and its structure to determine the legislative objective"). "[C]onsiderable deference must be accorded to the intent as the legislature has stated it." Id.

In this case, looking at the text of Article 120, there is no indication on the face of the provision of the legislative intent behind its enactment. Article 120, which was passed pursuant to a ballot question placed before Commonwealth voters, lacks any kind of express "statement of purpose" which legislation often includes, and none of its language reveals a particular government interest in felon disenfranchisement, either regulatory or punitive.[39] Instead, Article 120 merely lays out the substantive

---

[39] For an example of the kind of clear language "express[ing] the objective of [a] law in the statutory text itself," see Smith, 538 U.S. at 93 (citing the Alaska Legislature's public safety interest in "protecting the public from sex offenders" as the basis for its sex offender registration provision).

voting requirements, including the newly enacted exclusion of incarcerated felons.

Beyond the language of the provision, it is possible that the "broader structure" of the provision may provide some indication of its purpose. Id. The majority relies on the placement of Article 120 within the Commonwealth's civil voter qualification provisions, rather than in its criminal code, to infer a regulatory purpose. But while manner of codification is certainly one factor relevant to ascertaining the nature of a provision, the Supreme Court has held that the "location and labels of a statutory provision do not by themselves transform a civil remedy into a criminal one," or vice versa. Smith, 538 U.S. at 94; see also Trop, 356 U.S. at 94 ("How simple would be the tasks of constitutional adjudication and of law generally if specific problems could be solved by inspection of the labels pasted on them! Manifestly the issue of whether [a statute] is a penal law cannot be thus determined."). Rather, the Supreme Court instructs that "a penalty [] cannot be converted into [a non-penal measure] by so naming it," and we must "ascribe to [the particular statute] the character disclosed by its purpose and operation, regardless of name." United States v. Constantine, 296 U.S. 287, 294 (1935) (holding that even though labeled a "tax" on conducting retail liquor business, challenged statute was nevertheless a "penalty" designed to punish the violation of state liquor laws). Likewise, "even a clear

-78-

legislative classification of a statute as 'non-penal' would not alter the fundamental nature of a plainly penal statute." Trop, 356 U.S. at 95 (holding that a statute stripping army deserters of citizenship is a "penal law" despite its codification amidst the regulatory provisions of the "Nationality Act"); see also One Assortment of 89 Firearms, 465 U.S. at 364-65 (holding a forfeiture provision to be a civil action despite its codification in the state's criminal code). It follows that the Commonwealth's authority to regulate voting requirements as part of its civil power does not, in and of itself, establish that Article 120 was intended as a regulatory measure.

Moreover, any inference of legislative intent that could be drawn from the codification of Article 120 in a civil section of Massachusetts' constitution is undermined by the fact that the Commonwealth was required to amend that constitutional provision, which governs voting qualifications generally, in order to disenfranchise felons. In addition, the subject matter of Article 120 is consistent not only with civil voting requirements, but also with criminal rules imposing an additional deprivation upon persons convicted of particular crimes and in the custody of the criminal justice system. In that sense, Article 120's broader structure implies both criminal punishment and civil regulation. In sum, neither the language nor the structure of Article 120 betrays a clear regulatory or punitive intent.

Without a clear indication of intended purpose from Article 120 itself, we look to legislative history for evidence of legislative intent.[40]  Rolland v. Romney, 318 F.3d 42, 48 (1st Cir. 2003).  Here, there are two helpful sources of legislative history -- public statements made by Massachusetts' politicians about a series of disenfranchisement proposals that ultimately resulted in Article 120,[41] and the "Information for Voters" Guide ("the Guide") that was distributed to voters at the law's ratification stage.

First, the public statements of proponents of the legislation are quite revealing of the punitive motivation behind Article 120.  Writing to the Massachusetts Legislature to propose an earlier version of the instant disenfranchisement law, Governor Cellucci argued that "the time has come to tell would-be criminals in Massachusetts that committing crimes has serious consequences."[42]

_____

[40]  It is surprising that, given its extensive reliance on statements in the legislative history to analyze the clear statutory language of the VRA, the majority only mentions legislative history briefly in its Ex Post Facto Clause analysis, even though the language and structure of Article 120 is actually ambiguous as to whether Article 120 was intended to be punitive or regulatory.  While the majority states that it will consider certain comments made by Governor Cellucci, it never analyzes these or other comments by Article 120's proponents relevant to the legislative history of the provision.

[41]  The legislative process resulting in the passage of Article 120 is worth noting.  A constitutional amendment initiated by a legislator must be approved by two successive joint sessions of the Massachusetts legislature and then ratified by Massachusetts voters.  Commonwealth Mass. Const. Art. 49, Init., pt. IV, §§ 2-5.

[42]  I agree with the majority that, even though earlier proposals for felon disenfranchisement laws did not pass, their legislative histories are relevant here.  These earlier proposals

He advocated for the proposal because it would "ensure that criminals pay their debt to society before they regain their right to participate in the political process." Governor Cellucci also argued in favor of disenfranchising incarcerated felons because "prisons are a place for punishment." Striking a similar tone, State Representative Paul Frost argued that prisoners "don't deserve to vote" and that "this is an issue about justice." Senator Guy Glodis advocated for the law by stating that "philosophically, no inmates deserve the right to vote." These comments, reflecting classic punitive rationales, see, infra, section II.B.4 (discussing traditional theories of criminal punishment), provide strong evidence that Article 120 was motivated by an intent to punish felons.

As the majority recognizes, the Guide for voters regarding the ballot question that culminated in the enactment of Article 120, is also relevant to deciphering legislative intent. The Guide stated that the proposal would change the law that "allows criminals to continue to exercise control over our lives by voting from prison." The majority found such language to indicate regulatory intent. I disagree. While this language is more ambiguous as to intent than anything else, it suggests to me another

_____

are nearly identical to Article 120, so the motivation for them is relevant evidence for the motivation behind Article 120. See Kennedy v. Mendoza-Martinez, 372 U.S. 144, 180 (1963) (using the legislative history of earlier legislation when assessing the motivation of a law "quite obviously patterned on that of its predecessor").

retributive statement about what felons "deserve," i.e. to have their right to participate in government revoked. See id. The Guide also stated that "[a] yes vote will protect democracy's greatest gift - the right to vote, by reserving it for the law-abiding." I believe this language is further evidence of the punitive principle of "just desert." In any event, the ambiguous indications of intent revealed by the Guide do not outweigh the plainly punitive comments by the measure's proponents.

Confronted with potentially mixed manifestations of legislative purpose -- and I believe such a characterization is generous to the Commonwealth's position -- this court should decipher the law's "primary function." See Mendoza-Martinez, 372 U.S. at 169 (emphasis added). Whereas Article 120 itself is unclear as to intent, the Guide is also, at best, ambiguous, and the statements made by Massachusetts politicians are strongly indicative of punitive intent, I find that plaintiffs have made a compelling argument that the weight of the evidence of intent reveals Article 120 to have been intended primarily as a punitive measure. This punitive measure having been applied to plaintiffs retroactively, I believe that an Ex Post Facto violation could be found without further inquiry. But in an abundance of caution, I will proceed.

### B. The Effect of Article 120 Is Punitive

Under the second prong of the Smith analysis, even if a clear punitive intent is not discernable for the challenged law, it

-82-

would nevertheless constitute a criminal punishment subject to the Ex Post Facto Clause if the measure's effect is so punitive as to negate any intent to deem it civil. Hendricks, 521 U.S. at 361 (citing Ward, 448 U.S. at 248-49). The majority correctly explains that, in order to gauge the actual effect of the law, this court reviews the seven factors described in Mendoza-Martinez:

> [(1)] Whether the sanction involves an affirmative disability or restraint, [(2)] whether it has historically been regarded as a punishment, [(3)] whether it comes into play only on a finding of scienter, [(4)] whether its operation will promote the traditional aims of punishment-retribution and deterrence, [(5)] whether the behavior to which it applies is already a crime, [(6)] whether an alternative purpose to which it may rationally be connected is assignable for it, and [(7)] whether it appears excessive in relation to the alternative purpose assigned.

See Mendoza-Martinez, 372 U.S. at 168-69 (footnotes omitted). These factors, which are "neither exhaustive nor dispositive," serve as "useful guideposts." Smith, 538 U.S. at 97 (citations omitted).

I agree with the majority that, where the legislature has clearly stated a civil regulatory intent in enacting the challenged sanction, "'only the clearest proof' will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." Hudson v. United States, 52 U.S. 93, 100 (1997) (quoting Ward, 448 U.S. at 249). However, I disagree that plaintiffs should be held to that burden, in this case, where the legislative intent is ambiguous at best. The Supreme Court has

-83-

not resolved this particular question directly. However, where the legislature fails to make its intent clear through express language, or by implication through a law's broader structure, or even through legislative history, there is strong support for the proposition that a challenged law should be subjected to neutral evaluation when determining its effect. See Mendoza-Martinez, 372 U.S. at 169 (holding that, "[a]bsent conclusive evidence of congressional intent as to the penal nature of a statute, these factors must be considered in relation to the statute on its face"); Smith, 538 U.S. at 107 (Souter, J., concurring) (distinguishing between cases where the legislative intent is clear and those where it is ambiguous, and rejecting the "clearest proof" burden where it is ambiguous). Accordingly, I would approach the application of the Mendoza-Martinez factors, without any starting presumption, to determine whether the actual purpose or effect of Article 120 is punitive. See Mendoza-Martinez, 372 U.S. at 168-69. Applying the most relevant of these factors to the inquiry before us, I find that each of them weighs in favor of recognizing Article 120 to be a penal measure subject to the Ex Post Facto Clause.

### 1.  Scienter & Criminality

The third and fifth Mendoza-Martinez factors, "whether the challenged sanction comes into place only on a finding of scienter," and relatedly, "whether the behavior to which it applies is already a crime," weigh heavily in favor of concluding that

-84-

Article 120 is a penal statute.  See id. at 168.  First of all, "the disciplinary sanction here [is] triggered by a criminal conviction which incorporate[s] a finding of criminal intent, and so the disciplinary sanction came into play 'only on a finding of scienter,'" Porter v. Coughlin, 421 F.3d 141, 147 (2d Cir. 2005) (quoting Mendoza-Martinez, 372 U.S. at 168).  Similarly, as Article 120 applies only to persons who have already been convicted of a felony, "the behavior to which it applies is [undoubtedly] already a crime," as the fifth Mendoza-Martinez factor requires.  Mendoza-Martinez, 372 U.S. at 168; see also Dep't of Revenue of Montana v. Kurth Ranch, 511 U.S. 767, 781 (1994) (noting that fact that a tax on marijuana was "conditioned on the commission of a crime" is "'significant of [its] penal and prohibitory intent'").

## 2.  History

The second Mendoza-Martinez factor asks whether a particular sanction has "historically been regarded as punishment." Id. at 168.  There is substantial evidence to this effect.  First of all, federal courts have frequently characterized felon disenfranchisement as a punitive measure.  In its decision in Johnson, the Eleventh Circuit described felon disenfranchisement laws as a "punitive device stemming from criminal law" and explained that "throughout history, criminal disenfranchisement provisions have existed as a punitive device."  See 405 F.3d at 1228 & n.5. Similarly, the Second Circuit has noted the "nearly universal use

-85-

of felon disenfranchisement as a punitive device." Muntaqim v. Coombe, 366 F.3d 102, 123 (2d Cir. 2004) (vacated en banc on other grounds). "Congress [has also] recognized the punitive nature of felon disenfranchisement laws." See Pamela A. Wilkins, The Mark of Cain: Disenfranchised Felons and the Constitutional No Man's Land, 56 Syracuse L. Rev. 85, 133-34 (2005) (describing how Congressional acts readmitting former Confederate States to the Union did so on the condition that States prohibited disenfranchisement "except as a punishment for . . . crimes"). This point is reinforced by renowned historian, Alexander Keyssar's review of voting rights in this country in which he unequivocally characterizes America's felon disenfranchisement laws as an intentionally punitive device. Id. (citing Alexander Keyssar, The Right to Vote: The Contested History of Democracy in the United States 316 (2000)). And the ALI's Model Penal Code, a compilation examining the penal law of the United States, labels prisoner disenfranchisement "an integral part of the criminal law." Model Penal Code § 306.3 (Proposed Official Draft 1962). This is strong evidence that, regardless of how a particular disenfranchisement provision is codified, the purpose of disenfranchising felons in American history has been to punish them for their crimes.

There is also substantial evidence, presented by plaintiffs, of the historical use of felon disenfranchisement as a penal mechanism throughout the world. See Hayden, 449 F.3d at 315-

16 (describing use of "civil death" laws in Medieval continental Europe, "attainder" laws in medieval England, and "infamy" laws in ancient Greece and Rome, all of which revoked political rights, including the right to vote, "as additional punishment for [certain] crimes"); Keyssar, supra, at 62-63 ("Disenfranchisement for [infamous] crimes had a long history in English, European, and even Roman law, and it [is] hardly surprising that the principle of attaching civil disabilities to the commission of crimes appeared in American law as well."). Although the district court dismissed this evidence as not relevant to disenfranchisement provisions in American history, that approach misreads this factor as used in Mendoza-Martinez. In fact, in Mendoza-Martinez itself, the Supreme Court explicitly relied on the history of citizenship deprivation in other countries in determining that the challenged law depriving draft evaders of citizenship was punitive in effect. See 372 U.S. at 168 n.23 (discussing Roman and English societies' use of forfeiting citizenship as a punishment). Thus, evidence of the historical use of felony disenfranchisement laws both in this country and others is relevant, and both reveal the prevalent historic use of such laws as a penal mechanism.

To refute the extensive evidence that disenfranchisement laws have been historically regarded as punitive, the majority cites one court decision that did not concern the disenfranchisement of felons, Trop. See 365 U.S. at 96-97. Trop does contain dicta

suggesting hypothetically that "the purpose of [a felon disenfranchisement statute] is to designate a reasonable ground of eligibility for voting," id., but as dicta, that language is not binding upon us. See Wilkins, supra, at 102 (arguing that "Trop's discussion of disenfranchisement statutes was dicta and, therefore, does not excuse judges from the hard work necessary to analyze real disenfranchisement laws"). Trop also explains alternatively, that if "[disenfranchisement] were imposed for the purpose of punishing [an offender], the statute[] would be penal." 365 U.S. at 96-97. Moreover, that decision says nothing about how such laws have historically been regarded. In any event, the problem with relying on Trop's suggestion that felon disenfranchisement could be a "reasonable ground of eligibility for voting," is that Trop fails to reveal what legitimate purpose disenfranchisement serves that would render it a "reasonable ground." This failure to identify why disqualifying felons is a "reasonable ground" is particularly problematic in light of the fact that both cases cited by Trop for this proposition, Davis v. Beason and Murphy v. Ramsey, involve voting qualifications that are no longer regarded as valid.[43] As

_____

[43] See Romer v. Evans, 517 U.S. 620, 634 (1996) (holding that the decision of the Court in Davis v. Beason, 133 U.S. 333 (1890), which upheld the disenfranchisement of polygamists on grounds that they advocate "practical resistance to the laws of the Territory" and "approve the commission of crimes forbidden by it" is "no longer good law" because "persons advocating a certain practice may [not] be denied the right to vote"). Murphy v. Ramsey, 114 U.S. 15 (1885), involved a suit similar to Davis in which the Supreme Court upheld a voting qualification disqualifying any "polygamist, bigamist, or any person cohabiting with more than one woman . . ."

-88-

several scholars argue, Trop was decided at a time when the government had virtually unrestricted power to regulate the franchise, prior to the Warren's court's curtailment of that power when it recognized the fundamental nature of voting rights. See Wilkins, supra, at 102-04; Pamela S. Karlan, Convictions and Doubts: Retribution, Representation, and the Debate Over Felon Disenfranchisement, 56 Stan. L. Rev. 1147, 1150-54 (2004). As such, scholars argue that the dicta in Trop regarding the regulatory nature of felon disenfranchisement laws was premised on an "outdated conception of voting rights," rendering its continued validity questionable. Wilkins, supra, at 102-04.

Thus, seeing sparse evidence to the contrary, I am persuaded that the evidence cited by plaintiffs of the historical use of disenfranchisement weighs in favor of deeming the practice to be a punitive device.

### 3. Affirmative Disability or Restraint

In light of this country's struggle for independence in pursuit of participatory democracy and the centrality attributed to

---

from voting in Utah. Id. at 38, 42-43. Though Murphy was not expressly overruled by name, as was Davis in Romer, it is evident, given the similarity between the Davis and Murphy challenges, that neither decision continues to represent valid law. The rejection of this line of cases suggests that keeping "undesirable" persons, including felons, from voting is no longer a valid regulatory purpose.

-89-

the right to vote in our legal and political culture,[44] I am compelled to conclude that the deprivation of the franchise is an "affirmative disability or restraint" of the gravest sort.

Yet the majority concludes otherwise. In support of its holding that felon disenfranchisement does not constitute criminal punishment, the majority concludes that Article 120 does not impose "any affirmative disability or restraint, physical or otherwise." To the extent the majority suggests that a restraint need be "physical" in order to resemble a punitive sanction, such a requirement simply does not exist. Rather, Smith discusses physical restraints as only one kind of possible restraint a criminal law might impose. Smith, 538 U.S. at 100. In fact, our society regularly punishes wrongdoers without actually imposing physical restraints on them, most commonly, with criminal fines. And Supreme Court decisions tasked with applying the Mendoza-Martinez factors to ascertain the penal or regulatory nature of a particular sanction have regularly found non-physical sanctions to be affirmative disabilities or restraints. See, e.g., Kurth Ranch, 511 U.S. at 774 (holding a tax on illegal drugs to be a punitive measure in part because it "allowed for sanctions by restraint of Debtors' property"). In fact, Mendoza-Martinez itself held a non-physical

---

[44] See Werme v. Merrill, 84 F.3d 479, 482 (1st Cir. 1996) ("It is apodictic that the right to vote is a right that helps to preserve all other rights.").

sanction, the deprivation of citizenship, to constitute a sanction "essentially penal in character."

The majority also argues that disenfranchisement during incarceration is not an affirmative disability because it is "not as enduring as permanent occupational debarment." See Hawker v. New York, 170 U.S. 189 (1898) (holding that revocation of medical license does not violate the Ex Post Facto clause). But revoking a license to practice a particular profession is also not the deprivation of a fundamental right. In holding the revocation of citizenship rights to be punitive in Mendoza-Martinez, the Supreme Court emphasized that it is the "utmost import" and "value" of citizenship rights that renders their deprivation among the gravest of sanctions. Mendoza-Martinez, 372 U.S. at 160. Like citizenship itself, the right to vote, a fundamental component of citizenship, is certainly comparable in its utmost value and importance. Tashjian v. Republican Party, 479 U.S. 208, 217 (1986) (noting that the right to vote is a fundamental right inherent in citizenship). It is the importance of the right to vote that renders the gravity of its deprivation so devastating a "disability." See Reynolds v. Sims, 377 U.S. 533, 555 (1964) ("The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strikes at the heart of representative government."); Igartúa-De La Rosa v. United States, 417 F.3d 145, 177 (1st Cir. 2005) (Torruella, J., dissenting)

-91-

("There are few countries in the world in which the right to vote is as exalted as it is in the United States."); McLaughlin v. City of Canton, 947 F. Supp. 954, 971 (S. D. Miss. 1995) (describing disenfranchisement as the harshest sanction imposed by a democratic society and noting that when one is "brought beneath its axe, the disenfranchised is severed from the body politic and condemned to the lowest form of citizenship, where voiceless at the ballot box the disenfranchised, the disinherited must sit idly by while others elect his civic leaders and while others choose the fiscal and governmental policies that will govern him and his family"). Disenfranchisement, though neither physical nor permanent, deprives U.S. citizens of a fundamental right, and as such, is undoubtedly an affirmative disability.

### 4. Traditional Aims of Punishment

The fourth Mendoza-Martinez factor provides that a sanction is more likely punitive if "its operation will promote the traditional aims of punishment - retribution and deterrence." Mendoza-Martinez, 372 U.S. at 168; see also Bell v. Wolfish, 441 U.S. 520, 539 (1979) (noting that the Supreme Court has established that "[r]etribution and deterrence are not legitimate nonpunitive governmental objectives" (emphasis added)).[45] Of course, the threat

---

[45] See also Wilkins, supra, at 133 & n.316 (noting that in his history of American suffrage, Alexander Keyssar characterized felon disenfranchisement laws as intentionally punitive, noting that "disenfranchisement, whether permanent or for an extended period, serves as retribution for committing a crime and as a deterrent to

of being deprived of a fundamental right will, to a certain extent, always operate to deter a rational person from engaging in unlawful conduct.[46] But as the Supreme Court has recognized, the deterrent effect of a sanction cannot be wholly dispositive of criminal punishment as all civil penalties have some deterrent effect. See Kurth Ranch, 511 U.S. at 777. It is, however, in its retributive nature that felon disenfranchisement truly reveals its punitive colors. See Karlan, supra, at 1166 (arguing that "disenfranchisement really can be justified only under a retributive theory of criminal punishment"). In this sense, this factor also conclusively weighs in favor of the plaintiffs.

As a form of retribution, "'[p]unishment is the way in which society expresses its denunciation of wrongdoing.'" Gregg v. Georgia, 428 U.S. 153, 184 n.30. The notion is that the offender "owes a debt to society" and "must now atone for his sins by suffering punishment for his transgression." Peter W. Low et. al.,

---

future criminal behavior").

    [46] That some of Article 120's proponents considered this possibility is evident from statements such as that of Governor Celucci in his letter in support of the disenfranchisement amendment:

> The time has come to tell would be criminals in Massachusetts that committing crimes has serious consequences, not only in terms of prison time, but also in terms of the right to participate in deciding how society should be run.

(Emphasis added). This language suggests that the proposal was intended to deter "would be" criminals from committing crimes.

-93-

Criminal Law 2 (1982). "This . . . conception of punishment . . . makes primary the meting out to a responsible wrongdoer of his just deserts." H.L.A. Hart, Punishment and Responsibility, 158-59 (1968). Other scholars have characterized the retributive aim of criminal punishment as predicated upon the notion of restoring the status quo after an offender, by his contravention of the law, has usurped from his victim or from society generally, something to which he is not fairly entitled. See, e.g., Herbert Morris, Guilt and Innocence, 33-36 (1976) (characterizing punishment as restoring the fair distribution of benefits and burdens that is displaced when a person violates the rules that others have assumed, thereby gaining an unfair advantage); Jean Hampton, Retributivism and Its Critics (1992) (characterizing retributive punishment as a message that restores the prior status hierarchy between victim and offender which was violated by an offender's degradation of a victim's worth through criminality).

In the context of the retributive purposes of criminal punishment, it becomes apparent how fundamentally intertwined criminal disenfranchisement laws generally, and Article 120 in particular, are with this punitive objective. The statement from Governor Cellucci's letter, referenced supra, that the disenfranchisement proposal would "ensure that criminals pay their debt to society" is the textbook articulation of the retributive theory. Similarly, Representative Frost's statement that felons do

not "deserve to vote" is fundamentally linked to the retributive notion of "just deserts." And Representative Marini's promise that the law would apply to those who did "despicable things" is consistent with theory of retributive punishment as a means by which society expresses its moral denunciation of unlawful conduct.

Moreover, even the statements contained in the Information for Voters guide, cited by the Commonwealth as evidencing a regulatory non-punitive purpose, in fact, reveal the opposite when considered in the context of criminal punishment theory. For example, the statement that Article 120 would change the law that "allows criminals to continue to exercise control over our lives by voting from prison," is consistent with Morris' and Hampton's notions of retributive punishment as a means of restoring the proper hierarchy between the offender and society, unfairly tipped in the offender's favor by his desecration of society's rules. By preventing offenders from benefitting further, at society's expense, through their political participation, disenfranchisement helps to restore that lost equilibrium. Finally, felon disenfranchisement laws, by "deny[ing] the civic and human dignity of persons who have been convicted of doing wrong," are emblematic of the denunciatory function of criminal law. See Bell, 441 U.S. at 592-93 n.26 (Stevens, J., dissenting) (citing letter from Learned Hand to the University of Chicago Law Review).

## 5.  Connection to Non-Punitive Purpose

The sixth Mendoza-Martinez factor asks "whether an alternative purpose to which [the challenged sanction] may rationally be connected is assignable for it."  372 U.S. at 168-69.

I note, as a threshold matter and as discussed above, that there was no legitimate non-punitive purpose expressly assigned to Article 120, and that the purpose of the statute as revealed by its legislative history is primarily punitive.  But even if we were to speculate as to non-punitive rationales potentially assignable to the provision, I simply cannot agree with the majority that there is an "obvious rational non-punitive purpose for disenfranchisement."  The reality is that "[c]ourts have been hard pressed to define the state interest served by laws disenfranchising persons convicted of crimes."  Dillenburg v. Kramer, 469 F.2d 1222, 1224-25 (9th Cir. 1972) ("Appellee does not explain why disenfranchisement of those convicted of offenses that can result in confinement in state prison is 'necessary' to vindicate any identified state interest."); see also Stephens v. Yeomans, 327 F. Supp. 1182, 1188 (D.N.J. 1970) (striking down New Jersey felon disenfranchisement law because court "perceive[d] no rational basis for the . . . classification" of felons as a group that could not vote).

My reading of the legislative history of Article 120, much of which indicates a punitive motivation, and the lack of a

sufficient rational nexus to any non-punitive purpose, suggest that any purported regulatory motivations are, in fact, disingenuous. Moreover, the potential non-punitive rationales for felon disenfranchisement are, in many cases, now regarded as illegitimate grounds for restricting the vote, and as such, should not be credited. See Trop, 356 U.S. at 96 (holding that a statute is non-penal "if it imposes a disability, not to punish but to accomplish some other legitimate governmental purpose." (emphasis added)). That leaves criminal punishment as the only legitimate discernible "legislative aim" behind Article 120. I will consider, in turn, the various non-punitive justifications potentially assignable to Article 120 and explain why each cannot be rationally assignable to it.

First, the majority suggests that the "obvious rational non-punitive purpose for disenfranchisement" is the concern about felons "exercis[ing] control over [people's] lives by voting from prison." But as explained supra, this concern actually boils down to the punitive sentiment that felons do not "deserve" to do so.

Second, the Commonwealth argues, on appeal, that the purpose of Article 120, evidenced by its placement alongside other valid voter qualifications in the Massachusetts constitution, was to exempt from the franchise those persons "deem[ed] unfit to vote," such as minors, persons under guardianships, and persons convicted of corrupt election practices. That argument rests on the principle

that, due to their lack of respect for the criminal law, felons, like minors and mentally incompetent persons, "have raised questions about their ability to vote responsibly," and therefore, "cannot be trusted" to do so. Given the absence of any reference to voter "competence" in the legislative history of Article 120, and the weak connection between disenfranchising incarcerated felons and the alleged interest in responsible voting, I am inclined to dismiss this explanation as a pre-textual rationale masking a punitive purpose. See Hendricks, 521 U.S. at 371 (Kennedy, J., concurring) ("If the object or purpose of the Kansas law had been to provide treatment but the treatment provisions were adopted as a sham or mere pretext, there would have been an indication of the forbidden purpose to punish."). This is because disenfranchising felons is both under and over-inclusive of this alleged rationale. It is under-inclusive because if persons who violate the law have shown that they cannot vote responsibly, then not only incarcerated felons, but all persons who commit any kind of crime should be disenfranchised, whether they are serving a custodial sentence or not. Moreover, all citizens who for any reason have shown themselves to be irresponsible voters should be disenfranchised as well. It is over-inclusive because some incarcerated felons, despite their prior transgressions, may have, through the rehabilitative elements of their sentence, developed great respect for society's rules. While it is true that "[a] statute is not

-98-

deemed punitive simply because it lacks a <u>close or perfect</u> fit with the non-punitive aims it seeks to advance," <u>Smith</u>, 538 U.S. at 102-03 (emphasis added), the connection here seems especially attenuated, especially in light of the fundamental right that is at stake. This suggests that the concern with felons being "unqualified" is "simply a fictional concern advanced to mask a punitive purpose." <u>United States</u> v. <u>Brown</u>, 381 U.S. 437, 446-47 (White, J., dissenting).

More importantly, I question whether the Commonwealth can rely on a felon's purported incapacity to vote responsibly as the "non-punitive rationale" for Article 120 given that neither the ability to vote responsibly nor respect for the existing law remain "reasonable ground[s] of eligibility for voting." <u>See</u> <u>Trop</u>, 356 U.S. at 96-97. Rather, the idea that a particular group may be disqualified from voting based on a lack of respect for existing criminal law now constitutes a form of viewpoint discrimination that has been expressly rejected. <u>See</u>, <u>e.g.</u>, <u>Romer</u>, 517 U.S. at 634 (<u>see</u> parenthetical, <u>supra</u>, n.19); <u>Dunn</u> v. <u>Blumstein</u>, 405 U.S. 330, 354-56 (1972) (rejecting durational residency requirements that rested on claims about the desirability of ensuring that citizens understood, and shared, community values before they were permitted to vote); <u>see also</u> <u>Carrington</u> v. <u>Rash</u>, 380 U.S. 89, 94 (1965) ("'Fencing out' from the franchise a sector of the population because of the way they may vote is constitutionally impermissible."). Thus, according

to one scholar, "contemporary voting rights doctrine casts a serious shadow on the central traditional non-penal justification for felon disenfranchisement: the claim that ex-offenders should not be permitted to vote because they lack the qualities of mind or character voters ought to possess."  Karlan, supra, at 1152.

Third, a similar analysis applies to the purported non-punitive "regulatory" purpose arbitrarily assigned to Article 120 by the district court.  The district court suggested that prisoners are somehow unqualified to participate in the "participatory and collegial process" of "representative democracy" because they "have limited access to information and little opportunity to discuss issues with individuals who are not also being punished for breaking the law."  Not only is this "inability-to-become-informed" rationale entirely absent from the discussions motivating the enactment of Article 120, but it is simply not rationally connected with disenfranchising the entire convicted felon population, many of whom may very well have access to newspapers, media, and contact to outside visitors, as well as the leisure time to become politically informed, and thereby, even more knowledgeable voters than law-abiding persons on the "outside."  But again, and more importantly, the Supreme Court has consistently rejected restrictions on the franchise in order to further "knowledgeable or intelligent voting." See, e.g., Dunn, 405 U.S. at 356.  Thus, "[i]f neither good character nor intelligent use of the ballot nor support for existing

criminal laws are generally permissible prerequisites for voting, then it would be perverse to rely on criminal convictions as evidence that individuals lack qualities that voters are not required to have."  Karlan, supra, at 1155.  "The obvious alternative is to conclude that disenfranchisement is indeed punitive and that if it is to be justified, it must be justified as a legitimate form of punishment, rather than as a species of political regulation."  Id.

Finally, that this "alternative purpose" factor of the Mendoza-Martinez analysis weighs in favor of deeming Article 120 a punitive sanction is bolstered by examining what has been found to constitute a "legitimate non-punitive purpose" in prior Mendoza-Martinez cases, and what has not.  That examination reveals that those cases holding particular sanctions to constitute non-punitive regulatory measures have served far clearer and more substantial societal interests than the attenuated justifications provided for felon disenfranchisement.  For example, in Hendricks, the state civil commitment law held to be non-punitive was intended to protect the public from dangerous mentally ill persons "likely to engage in 'predatory acts of sexual violence.'" 521 U.S. at 350.  Similarly, Alaska's sexual offender registration requirement, held to be non-punitive in Smith, had the express purpose of "protecting the public from sex offenders" who "pose a high risk of reoffending." 538 U.S. at 93; see also United States v. Salerno, 481 U.S. 739, 747

(1987) (holding that preventative detention under Bail Reform Act, justified by the need to prevent "danger to the community," was regulatory and preventative, rather than punitive).

On the other hand, the provision being challenged before us bears a far greater resemblance to the one at issue in Mendoza-Martinez itself. In Mendoza-Martinez, where "there was no reference to the societal good that would be wrought by the legislation," the Supreme Court concluded that "the obvious inference" was that "Congress was concerned solely with inflicting effective retribution upon this class of draft evaders and, no doubt, on others similarly situated." Mendoza-Martinez, 372 U.S. at 182; see also Trop, 356 U.S. at 97-98 (holding that statute stripping military deserters of citizenship rights cannot rationally be treated other than as a penal law). Finding no legitimate non-penal interest served by the legislation, the Supreme Court in Mendoza-Martinez did not go on to speculate as to potential alternative justifications. But even if it had, the conceivable legitimate non-penal justification for stripping an American of his citizenship rights for violating a criminal statute prohibiting the evasion of military service, as in Mendoza-Martinez and Trop, is no more substantial than the conceivable justifications for stripping a U.S. citizen of an essential component of those rights (i.e. voting), for violating another criminal statute. Of course, one could argue that by abandoning the obligations of citizenship by evading the military

obligations attendant thereto, a person shows that he is not "competent" to exercise the benefits and burdens of citizenship, just like one could argue that a person who breaches the criminal law shows that he is not competent to exercise the responsibility of aiding in its enactment. But the Supreme Court has refused to make this leap, and neither should we here. Given the similarities between the respective sanctions[47] -- deprivation of citizenship and deprivation of voting rights -- the lack of any clear non-punitive interest for either sanction, and the similar triggering event for the imposition of each, namely, violation of a criminal law, I think we are compelled by Mendoza-Martinez to hold Article 120 to be a penal measure. Finding Article 120 to be a penal measure, its constitutionality is subject to the constraints of the Ex Post Facto Clause, and violates that clause as retroactively applied to the plaintiffs.

To be abundantly clear, I see nothing constitutionally impermissible about disenfranchising felons as a form of criminal punishment. Criminals who are convicted of serious offenses pursuant to a legitimate process are properly deprived by the state

---

[47] See Nw. Austin, 557 U.S. at ___, 2009 WL 1738645 at *7 (describing "the right to vote" as "one of the most fundamental rights our citizens"); Tashjian, 479 U.S. at 217; Wolfish, 441 U.S. at 589-90 & n.22 (Stevens, J. dissenting) (noting that "[t]he withdrawal of rights is itself among the most basic punishments that society can exact, for such a withdrawal qualifies the subject's citizenship and violates his dignity" and citing disenfranchisement as the "classic example of the coincidence of punishment and the total deprivation of rights").

of a panoply of fundamental individual and civil rights. But "punishment" must be labeled what it is, and imposed only in compliance with the time-honored constitutional guarantees that legitimate the exercise of that practice. Central among these guarantees is the prohibition against the enactment of ex post facto laws. As Article 120 inflicts a greater punishment upon convicted felons than the law annexed to their crimes when committed, see Calder v. Bull, 3 Dall. 386, 390 (1798), I would invalidate its retroactive application. Thus, I would reverse the decision of the district court as to the ex post facto claim, and order that judgment be entered for plaintiffs.

For the reasons herein stated, I respectfully **dissent**.